NO. 4-06-0226    Filed 2/26/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| MARCELUS WITHERSPOON, | ) | No. 05CF1253 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In a fit of jealousy, defendant, Marcelus Witherspoon, beat up his girlfriend. The State brought charges against him. A jury convicted him of several counts, and the trial court sentenced him to six years each on counts V and VI (attempt (aggravated criminal sexual assault)), three years for count VIII (aggravated domestic battery) and one year for count IX (domestic battery with a prior domestic-battery conviction)--all sentences to run consecutively, for a total of 16 years in prison. Defendant appeals, arguing (1) the State failed to prove him guilty beyond a reasonable doubt of count VI, attempt, because the evidence failed to demonstrate that he made a second attempt to commit aggravated criminal sexual assault with the board; and (2) the court erred in ordering consecutive sentences. The State concedes, and we agree, that the sentences on counts VIII and IX should be concurrent instead of consecutive; we remand the case

with directions to amend the sentencing order accordingly. Otherwise, we affirm defendant's convictions as modified.

## I. BACKGROUND

### A. The Information

The information contains nine counts, all of them alleging acts of violence that defendant perpetrated against K.D. on September 6, 2005. Counts I through IV charge him with aggravated criminal sexual assault, a Class X felony (720 ILCS 5/12-14(a)(2), (d)(1) (West 2004)). Count I alleges that by the use of the force, he placed a knife sharpener on K.D.'s vagina and in so doing, inflicted bodily harm upon her by striking her on the face with his hands. Count II is identical to count I except it alleges he placed the knife sharpener on her vagina "a second time." Count III alleges he placed the knife sharpener on her vagina and in so doing, threatened her life by strangling her about the neck with his hands. Count IV is identical to count III except it alleges he placed the knife sharpener on her vagina "a second time."

Counts V and VI charge defendant with attempt (aggravated criminal sexual assault), a Class 1 felony (720 ILCS 5/8-4(a), (c)(2), 12-14(a)(2) (West 2004)). We quote these two counts because, in our analysis, we refer to them in detail. Count V reads as follows:

"[D]efendant *** commit[ted] the offense

- 2 -

of attempt (aggravated criminal sex-
ual), in that ***, with the intent to com-
mit the offense of [a]ggravated [c]riminal
[s]exual [a]ssault, *** [he] performed a
substantial step toward the commission of
that offense, in that ***, while holding a
piece of wood, [he] grabbed [K.D.], held her,
and tried to ram the board into the sex organ
of [K.D.]."

Count VI is identical to count V except for the addition of the
final adverbial phrase "tried to ram the board into the sex organ
of [K.D.], a second time."  (Emphasis added.)

Counts VII and VIII charge defendant with aggravated
domestic battery, a Class 2 felony (720 ILCS 5/12-3.3(a), (b)
(West 2004)).  Count VII alleges he caused "great bodily harm" to
K.D., a family or household member, by striking her in both her
legs with a board, inflicting contusions to her inner right
thigh, right calf, left leg, and left ankle.  Count VIII alleges
he caused her "great bodily harm" by striking her approximately
12 times in the face with both of his open hands, inflicting
contusions to her eyes, her chin, and the right side of her neck.

Count IX charges defendant with domestic battery with a
prior domestic-battery conviction, a Class 4 felony (720 ILCS
5/12-3.2(a)(1), (b) (West 2004)), in that having been previously

convicted of domestic battery in People v. Witherspoon, case No. 01-CF-853 (Cir. Ct. Macon Co.), he threw K.D. onto the couch and strangled her with his hands to the point where she could not breathe.

## B. The Trial

In the jury trial, K.D. testified she had known defendant for years and dated him a couple of months. On September 5, 2005, he rang her cellular telephone repeatedly, but she did not answer, for she was unwilling to speak with him at the time. On September 6, 2005, she arrived home around 1:45 a.m. As she pulled into her driveway, defendant pounded on the windows of her truck, asking her where she had been and why she had not answered his calls. When she got out of the truck, he grabbed her by the hair on the back of her head and escorted her to the front door of her house. She unlocked the door, and they went inside. In the living room, he struck her in the face about a dozen times with his open hands, making her ears ring and her nose and mouth bleed. Then he calmed down momentarily and told her to go clean the blood off her face. When she emerged from the bathroom, he tried to cut her hair off with a knife, accusing her of being with someone else. She fought him off, and he calmed down again and ordered her to go to bed. She did so, and soon thereafter, he entered the bedroom, and they had sex ("I didn't refuse him"). He then returned to the living room, and she slept.

- 4 -

Defendant woke her a couple of hours later and told her was going to leave and attend to some business. K.D. let him have the keys to her truck. He told her he would be back. She got out of bed and took a shower, trying to make herself feel better. While she was showering, defendant came back into her house. He had her purse, which he had taken out of her truck. He turned off the water in the shower and flung the purse at her, demanding to know why she had condoms in her purse. He grabbed her by the hair of her head and pulled her, wet and naked, out of the shower and into the living room. She testified:

"A. I'm on the ground, and he's asking
me why I have condoms, who[m] else am I
fucking, stuff of that nature. He goes and
grabs a [two- by - four-inch] board that I
use to lock my back [sliding-glass] door
with, and I get up off the ground and go[]
into the kitchen[] [be]cause I don't know
what he's doing. I see him come back with a
board, and I'm thinking[,] [W]hat are you
doing? And he starts hitting me with it in
the legs like a baseball bat.

Q. So, you were the baseball[,] and the
board was the bat?

A. Evidently.

- 5 -

Q. Okay. Where did he hit you in the legs?

A. He struck me multiple times in my legs.

Q. Which ones? Both?

A. Both of them.

Q. Thighs?

A. Thighs, cal[ves], outside, inside, ankle.

Q. Okay.

A. All over my lower extremities.

Q. Okay.

A. I think he got me on the arm [good one] time with it.

Q. And at this point, what are you thinking?

A. I mean, I don't know what to think. I'm laying [sic] on the ground. He's telling me to open up my legs, and he's obviously trying to hurt me. I mean, I don't know. I was trying to fight him. I remember trying to kick at him.

* * *

Q. *** So, what did he attempt to do

- 6 -

when you didn't open your legs?

A. He put the board down again.  I got

up.  I ran to the door stark naked."

K.D. was so desperate that she tried to run outside without any clothes on ("because, I mean, this is extreme"), but defendant reached the door before she did and pushed her back and got her in a headlock.  He threw her onto the living-room couch, gripped her neck with both hands, and began strangling her.  She saw red and black and was on the verge of passing out.  "'I can't breathe.  I can't breath[e]," she told him.  "'I don't care,'" he replied.  Then he released her, and as she lay dazed on the couch, he went into the kitchen and returned with a "knife sharpener."  He pinned her to the couch and told her to open her legs.  They struggled.  He got one of his hands inside her vagina, and with the other hand, he tried to push the knife sharpener into her vagina as she tried to push it away.  The prosecutor asked her:

"Q. ***  Was Mr. Witherspoon successful

in inserting the knife sharpener into your

vagina?

A. No.

Q. Did he touch your labia with the

knife sharpener?

A. It touched me, but it never went

- 7 -

inside of me.

Q. And about how many times did it touch you?

A. Once or twice.

Q. Once or twice. Okay. Then what happened?

A. I don't remember how things calmed down after that.

Q. But things calmed down?

A. He left again."

It was about 9:30 a.m. when defendant left; he drove away in her truck, taking her keys and cellular telephone with him. While he was gone, K.D. finished taking a shower and left a voice-mail message for her mother. She did not telephone the police at that time because she was scared and in her past experience, the police had proved ineffectual. "I mean, you call them. They come two or three hours later." About 10:30 or 11 a.m., defendant returned with a friend, and the three of them watched television on the back porch and had something to eat. At 2 p.m., defendant dropped her off at work (she was a cashier in a truck stop). Seeing the bruises on her face and her cut lip, her coworkers urged her to call the police. K.D. balked, so they called the police for her. Two and a half hours later, a police officer arrived. The prosecutor asked K.D.:

- 8 -

"Q. When you spoke to the officer who responded, did he offer to have Decatur Ambulance Service take you to the hospital?

A. Yeah.  He asked me multiple times if I wanted that.

Q. An[d] did you turn him down each time?

A. Yes, I did.

Q. Did you go to the hospital?

A. Yes, I did when my mother--

Q. How did you get there?

A. My mother arrived at my job, and she took me."

An emergency-room physician, James Riley, testified he treated K.D. on September 6, 2005.  He diagnosed bruises on her face, neck, upper arm, legs, and ankle and a laceration to her lip.  Photographs, admitted into evidence, show the reddish-purple bruises.  Some of the bruises were swollen.  X-rays of her legs revealed no fractures.  The doctor found no injury to her external genitalia.  He gave her a shot of pain medication and outfitted her with crutches.  K.D. testified:  "[M]y legs were pretty swollen and bruised.  They wanted me to stay off of them for a while.  I couldn't go to work for the rest of the week."

The jury acquitted defendant of counts I through IV

(aggravated criminal sexual assault) but found him guilty of counts V and VI (attempt (aggravated criminal sexual assault)), counts VII and VIII (aggravated domestic battery), and count IX (domestic battery with a previous domestic-battery conviction).

In the sentencing hearing, the trial court found that the facts forming the basis of count VII were the same as those forming the basis of counts V and VI; therefore, the court vacated the conviction on count VII. The court used the jury's finding of great bodily harm in its guilty verdict on count VII to support a finding of "severe bodily injury" on counts V and VI for purposes of consecutive sentencing. See 730 ILCS 5/5-8-4(a)(i) (West 2004). The court sentenced defendant to the following terms of imprisonment: six years for count V, six years for count VI, three years for count VIII, and one year for count IX. The court ordered that all of these terms run consecutively. Defendant filed a motion to reconsider the sentence, which he contended was an abuse of discretion and a misapplication of section 5-8-4(a)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a)(i) (West 2004)). The court denied the motion.

This appeal followed.

## II. ANALYSIS

### A. The State Proved Defendant Guilty of Two Attempts (Aggravated Criminal Sexual Assault With the Board), and the Two Convictions Did Not Violate the One-Act, One-Crime Doctrine

- 10 -

Defendant argues the evidence only demonstrated one attempt of aggravated criminal sexual assault with the board. We disagree.

This case raises two related issues of whether multiple convictions can be entered, pursuant to the one-act, one-crime doctrine, and whether, if defendant committed separate acts, the State presented sufficient evidence to support a conviction for those separate acts.

To determine whether multiple convictions may properly be entered, courts must engage in a two-step analysis. First, the court must determine whether the defendant's conduct consisted of separate acts or a single physical act. People v. Rodriguez, 169 Ill. 2d 183, 186, 661 N.E.2d 305, 306 (1996). An "act" is "any overt or outward manifestation which will support a different offense." People v. King, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977). While multiple convictions based on the same physical act are improper (Rodriguez, 169 Ill. 2d at 186, 661 N.E.2d at 306), "'[a] person can be guilty of two offenses [even] when a common act is part of both offenses' [citation]" (Rodriguez, 169 Ill. 2d at 188, 661 N.E.2d at 308).

If a defendant committed more than one act, the trial court must then determine whether any of the offenses are lesser-included offenses. Rodriguez, 169 Ill. 2d at 186, 661 N.E.2d at 306. If an offense is a lesser-included offense, multiple

- 11 -

convictions are improper. Rodriguez, 169 Ill. 2d at 186, 661

N.E.2d at 306-07. If the offense is not a lesser-included

offense, then multiple convictions are permissible. Rodriguez,

169 Ill. 2d at 186, 661 N.E.2d at 306-07. Our review on these

issues is de novo. People v. Milton, 309 Ill. App. 3d 863, 868,

723 N.E.2d 798, 802 (1999).

In this case, the State charged defendant with two

counts of attempt (aggravated criminal sexual assault) involving

the board. Section 8-4(a) of the Criminal Code of 1961 defines

the offense of attempt as follows: "A person commits an attempt

when, with intent to commit a specific offense, he does any act

which constitutes a substantial step toward the commission of

that offense." 720 ILCS 5/8-4(a) (West 2004). Thus, the offense

of attempt consists of two elements: (1) an intent to commit a

specific offense, together with (2) an overt act constituting a

substantial step toward the commission of that offense. People

v. Davis, 43 Ill. App. 3d 603, 614, 357 N.E.2d 96, 104-05 (1976).

Because multiple offenses for a series of related acts may be

found where the State apportions the acts in the charging instru-

ment and at trial, it only follows that the same should hold true

for multiple attempts. See People v. Crespo, 203 Ill. 2d 335,

345, 788 N.E.2d 1117, 1123 (2001) (holding that for the State to

properly obtain multiple convictions for connected acts that

might be treated as a series of offenses, the State must appor-

tion the acts to the offenses in the charging instrument). Just as multiple penetrations can support separate offenses of aggravated criminal sexual assault, multiple attempts to commit aggravated criminal sexual assault can support multiple convictions for attempt. See, e.g., People v. Olivieri, 334 Ill. App. 3d 311, 318, 778 N.E.2d 714, 719 (2002) (affirming conviction for three counts of aggravated criminal sexual assault where the charging instrument, evidence presented at trial, and the State's opening and closing arguments clearly referenced three separate sexual acts).

In this case, the State apportioned defendant's acts by charging him with two counts of attempt (aggravated criminal sexual assault with the board). Count V of the information alleged as follows:

> "[D]efendant *** commit[ted] the offense
> of attempt (aggravated criminal sexual as-
> sault), in that ***, with the intent to com-
> mit the offense of [a]ggravated [c]riminal
> [s]exual [a]ssault, *** [he] performed a
> substantial step toward the commission of
> that offense, in that ***, while holding a
> piece of wood, [he] grabbed [K.D.], held her,
> and tried to ram the board into the sex organ
> of [K.D.]."

Count VI alleged as follows:

"[D]efendant *** commit[ted] the offense of attempt (aggravated criminal sexual assault), in that ***, with the intent to commit the offense of [a]ggravated [c]riminal [s]exual [a]ssault, *** [he] performed a substantial step toward the commission of that offense, in that ***, while holding a piece of wood, [he] grabbed [K.D.], held her, and tried to ram the board into the sex organ of [K.D.], a second time."  (Emphasis added.)

The State also treated the acts as separate during trial.  In her closing arguments, the prosecutor described count V and the evidence supporting that count.  The prosecutor referenced defendant using the board to beat K.D., getting her on the ground, telling her to open her legs, and attempting to ram the board inside her.  The prosecutor stated that count VI referenced a second attempt to do the same thing.  The prosecutor also stated the "substantial step" toward committing aggravated criminal sexual assault was defendant's direction to K.D. to open her legs and the attempt to use the board.

Consistent with the State's theory, the trial court instructed the jury on two different offenses evidenced by two different acts.  The court instructed the jury via a definitional

- 14 -

instruction as follows:

> "A person commits the offense of attempt
> when he, with the intent to commit the of-
> fense of aggravated criminal sexual assault,
> does any <u>act</u> which constitutes a substantial
> step toward the commission of the offense of
> aggravated criminal sexual assault.
>
> The offense attempted need not have been
> committed."  (Emphasis added.)

See Illinois Pattern Jury Instructions, Criminal, No. 6.05 (4th ed. 2000) (hereinafter IPI Criminal 4th).  The court also instructed the jury via an issues instruction that the State had to prove the following:

> "First Proposition: That the defendant
> performed an <u>act</u> which constituted a substan-
> tial step toward the commission of the of-
> fense of aggravated criminal sexual assault;
>
> Second Proposition: That the defendant
> did so with the intent to commit the offense
> of aggravated criminal sexual assault.
>
> If you find from your consideration of
> all the evidence that each one of these prop-
> ositions has been proved beyond a reasonable
> doubt, you should find the defendant guilty.

- 15 -

          "If you find from your consideration of

          all the evidence that any one of these propo-

          sitions has not been proved beyond a reason-

          able doubt, you should find the defendant not

          guilty."   (Emphasis added.)

See IPI Criminal 4th No. 6.07.  The verdict forms distinguished

between the two counts by referring to one as "first with piece

of wood" and the other as "second with piece of wood."  Clearly,

the State apportioned the acts to the separate offenses.  Because

one offense is not a lesser-included offense of the other,

multiple convictions in this case do not violate the one-act,

one-crime doctrine.

          Having found, in this case, that a series of related

acts can support separate attempt offenses, we next address

whether the State presented sufficient evidence that defendant

twice attempted to commit aggravated criminal sexual assault on

K.D. by use of the board.  Where a defendant challenges the

sufficiency of the evidence, the test is whether, after viewing

the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.  People v. Ward, 215 Ill. 2d

317, 322, 830 N.E.2d 556, 559 (2005).  It is not the function of

the appellate court to retry the defendant.  People v. Slinkard,

362 Ill. App. 3d 855, 857, 841 N.E.2d 1, 3 (2005).  This court

must be mindful that it was the jury who saw and heard the witnesses.  People v. Evans, 369 Ill. App. 3d 366, 379, 859 N.E.2d 642, 652 (2006).

In this case, the State presented sufficient evidence that defendant twice attempted to commit criminal sexual assault. Intent can rarely be proved by direct evidence because it is a state of mind.  See People v. Williams, 165 Ill. 2d 51, 64, 649 N.E.2d 397, 403 (1995).  Instead, intent may be inferred from surrounding circumstances and thus may be proved by circumstantial evidence.  Williams, 165 Ill. 2d at 64, 649 N.E.2d at 403.

In this case, K.D. testified "[h]e's telling me to open up my legs, and he's obviously trying to hurt me."  K.D.'s use of the present progressive or present continuous voice ("telling") denotes multiple statements and that defendant told K.D. more than once to open her legs, as does the use of the term "trying" denote multiple attempts to get the board inside K.D.'s vagina. K.D. also testified defendant struck her multiple times both outside and inside both legs, including her thighs, calves, and ankles.  The multiple directions by defendant for K.D. to open up her legs and the multiple attempts to open K.D.'s legs so as to get the board inside K.D.'s vagina constitute sufficient evidence from which a rational trier of fact could find that defendant committed two offense of attempt (aggravated criminal sexual assault).  Further, although defendant was not convicted of the

four aggravated criminal sexual assault charges involving the knife sharpener, that evidence of multiple attempts may be considered by the jury as evidence of defendant's intent to attempt to rape K.D. multiple times.

Consequently, the jury's verdict was not so unreasonable as to raise reasonable doubt as to defendant's guilt on count VI.

B. Ordering All the Sentences To Run Consecutively

In reliance on section 5-8-4(a)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a)(i) (West 2004)), the trial court made the terms of imprisonment consecutive rather than concurrent. That section provides as follows:

"(a) When multiple sentences of imprisonment are imposed on a defendant at the same time, *** the sentences shall run concurrently or consecutively as determined by the court. *** The court shall impose consecutive sentences if:

(i) one of the offenses for which [the] defendant was convicted was first degree murder or a Class X felony or Class 1 felony and the defendant inflicted severe bodily injury[.]" 730 ILCS 5/5-8-4(a)(i)

- 18 -

(West 2004).

In People v. Whitney, 188 Ill. 2d 91, 98-99, 720 N.E.2d 225, 229 (1999), the supreme court limited section 5-8-4(a)(i) to those situations in which "the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury during the commission of that felony."  (Emphasis added.)

In the sentencing hearing in the present case, the trial court stated:  "As to [c]ounts V and VI, I am going to refer back to the jury's finding on [c]ount VII, although I vacated [the conviction on that count;] [in returning a guilty verdict on count VII,] the jury has found great bodily harm. So[,] on [c]ount[] V and [c]ount VI, I will find that [s]ection [5-8-4(a)(i)] does apply."  For two reasons, defendant argues the court erred.  First, to qualify for consecutive sentences under section 5-8-4(a)(i), defendant had to inflict "severe bodily harm" while committing a triggering offense, i.e., first degree murder or a Class X or Class 1 felony.  See Whitney, 188 Ill. 2d at 98-99, 720 N.E.2d at 229.  Count VII, aggravated domestic battery, was a Class 2 felony and, therefore, not a triggering offense.  The only triggering offenses of which the jury found defendant guilty were counts V and VI, charging him with attempt (aggravated criminal sexual assault), a Class 1 felony.

One would not necessarily have to understand the trial

court as saying that count VII was a triggering offense. Alternatively, even if one did understand the court as so saying, that error would not be essential to the court's rationale. Essentially, the court reasoned as follows. To find defendant guilty of count VII, the jury had to find that he inflicted "great bodily harm" upon K.D. by striking her in the legs with the board. The question before the court, in the sentencing hearing, was whether defendant inflicted "severe bodily injury" upon K.D. while committing counts V and VI, i.e., while attempting to commit aggravated criminal sexual assault with the board. The difference between "great bodily harm" and "severe bodily injury" is merely semantic; no meaningful distinction can be made between "great" and "severe" or between "harm" and "injury." For purposes of section 5-8-4(a)(i), the court decided to defer to the jury's finding that the bruises defendant inflicted upon K.D.'s legs, ankle, and upper arm by hitting her with the two- by four-inch board were, collectively, a "great bodily harm" or a "severe bodily injury." This logic makes sense to us.

According to defendant, the second reason why the trial court erred is that he did not, in fact, inflict severe bodily injury upon K.D. when committing the acts alleged in counts V and VI. As defendant understands K.D.'s testimony, he first hit her multiple times with the board and then ordered her to open her legs. Thus, defendant argues, "the acts that constituted [c]ount

- 20 -

VII [(the beating with the board)] were completed before [he] undertook the actions that constituted [c]ount V [(grabbing K.D. and trying to ram the board into her vagina)]."  The chronology is not so clear to us from our reading of K.D.'s testimony.  She testified:  "I'm laying [sic] on the ground.  He's telling me to open up my legs, and he's obviously trying to hurt me."  She could have meant he was still trying to hurt her by striking her with the board.  Moreover, even if defendant desisted from hitting her with the board before telling her to open her legs, hitting her with the board was one of the substantial steps he took in attempting to commit aggravated criminal sexual assault with the board.  A photograph shows a livid, straight-edged bruise on the inside of her calf; one could infer he was trying to beat her legs apart so as to expose her vagina.  Counts V and VI do not allege that hitting her with the board was one of the substantial steps he took, but, as we held in People v. Mullinax, "the allegations of the information, with respect to the precise manner in which the defendant took a substantial step toward[] the commission of the crime, [are] surplusage" (emphasis omitted) (People v. Mullinax, 67 Ill. App. 3d 936, 941, 384 N.E.2d 1372, 1376 (1979)).

Defendant also argues that K.D.'s injuries were not serious enough to qualify as "severe bodily injury" within the meaning of section 5-8-4(a)(i).  He quotes People v. Williams,

335 Ill. App. 3d 596, 600-01, 781 N.E.2d 574, 577-78 (2002), in which the First District compiled cases to illustrate the difference between bodily injury and severe bodily injury for purposes of section 5-8-4(a)(i):

"Cases finding the existence of severe bodily injury include: People v. Johnson, 149 Ill. 2d 118, 594 N.E.2d 253 (1992) (victim shot in the shoulder, in the hospital the next day); People v. Kelley, 331 Ill. App. 3d 253, 770 N.E.2d 1130 (2002) (victim shot twice in the right arm, hospitalized for three days); People v. Austin, 328 Ill. App. 3d 798, 767 N.E.2d 433 (2002) (victim shot in the back and grazed on the side of the head near his left ear, injuries that required overnight hospitalization); People v. Amaya, 321 Ill. App. 3d 923, 748 N.E.2d 1251 (2001) (one victim shot in the stomach, the other in the back; both required surgery and a lengthy hospital stay, the bullet remaining in one victim at the time of trial); People v. Primm, 319 Ill. App. 3d 411, 745 N.E.2d 13 (2000) (victim shot in the back of his left thigh, taken to the hospital); People v.

<u>Strader</u>, 278 Ill. App. 3d 876, 663 N.E.2d 511 (1996) (victim struck by three bullets from defendant's rifle, one of them removed surgically); <u>People v. Townes</u>, 94 Ill. App. 3d 850, 855, 419 N.E.2d 604[, 607] (1981) (victim's face was '"beaten up,"' eye almost swollen closed, X rays ordered by doctors to investigate possible bone damage).

Cases finding a failure to prove severe bodily injury include: <u>People v. Jones</u>, 323 Ill. App. 3d 451, 752 N.E.2d 511 (2001) (bullet grazed victim's right cheek bone, receiving a band-aid from a doctor but no other medical attention); <u>People v. Rice</u>, 321 Ill. App. 3d 475, 747 N.E.2d 1035 (2001) (one bullet struck victim in the hand, another in the hip, taken to hospital where he remained for two days); <u>People v. Murray</u>, 312 Ill. App. 3d 685, 728 N.E.2d 512 (2000) (victim suffered gunshot wound to the right foot with an open fracture to the big toe, treated and released within [2 1/2] hours after the shooting); <u>People v. Durham</u>, 312 Ill. App. 3d 413, 419, 727 N.E.2d 623[,627] (2000) (vic-

tim's gunshot wound described as a mark, '"like a small nick or cut"'); People v. Ruiz, 312 Ill. App. 3d 49, 726 N.E.2d 704 (2000) (victim police officer suffered gun-shot wound to knee, wound barely visible, went to a meeting before seeking medical treatment); In re T.G., 285 Ill. App. 3d 838, 674 N.E.2d 919 (1996) (not enough for 'great bodily harm' under the aggravated battery statute where victim suffered three stab wounds to the chest, felt only the first stab, had three bloody wounds)." Williams, 335 Ill. App. 3d at 600-01, 781 N.E.2d at 577-78.

The problem with this comparative approach is that our standard of review is deferential. See Townes, 94 Ill. App. 3d at 855, 419 N.E.2d at 607 ("find[ing] no reason to disturb the trial court's discretion" regarding the issue of whether severe bruising of the face and neck, inflicted during the commission of a Class X felony, was a severe bodily injury for purposes of section 5-8-4(a) (Ill. Rev. Stat. 1979, ch. 38, par. 1005-8-4(a)). Just because the appellate court found no abuse of discretion in the finding that a particular injury was not severe, it does not follow that the opposite finding would have

been an abuse of discretion either. Both findings could have been rationally defensible. The injuries to K.D.'s legs were not trivial. From the looks of them in the photographs, they were extremely painful. The doctor saw the need to take X-rays. He also gave her crutches and told her to stay off her feet for the rest of the week (four days). We will defer to the trial court's finding that the bruising of K.D.'s legs, ankle, and upper arm was a "severe bodily injury" within the meaning of section 5-8-4(a)(i). The sentence on counts V and VI shall be consecutive, as the court ordered.

The State concedes that the terms of imprisonment on counts VIII and IX should be concurrent. We agree with that concession. We are aware of no statutory authority for making those terms consecutive. In People v. Curry, 178 Ill. 2d 509, 539, 687 N.E.2d 877, 892 (1997), the supreme court held:

> "[S]ection 5-8-4(a) must be construed so that any consecutive sentences imposed for triggering offenses be served prior to, and independent of, any sentences imposed for nontriggering offenses. Sentences for multiple nontriggering offenses may be served concurrently to one another after any consecutive sentences for triggering offenses have been discharged."

Accordingly, defendant shall serve his six-year term of imprisonment on count V first, then his six-year term of imprisonment on count VI, and then he shall serve his two concurrent terms on counts VIII and IX.

### III. CONCLUSION

For the foregoing reasons, we remand this case with directions to amend the sentencing order so as to provide that defendant shall serve his consecutive term of imprisonment on count V first, his consecutive term of imprisonment on count VI second, and thereafter serve his concurrent terms of imprisonment on counts VIII and IX. Otherwise, we affirm the trial court's judgment as modified and remand with directions. Because the State has in part successfully defended a portion of the criminal judgment, we grant the State its statutory assessment of $50 against defendant as costs of this appeal. See People v. Smith, 133 Ill. App. 3d 613, 620, 479 N.E.2d 328, 333 (1985), citing People v. Nicholls, 71 Ill. 2d 166, 179, 374 N.E.2d 194, 199 (1978).

Affirmed as modified; cause remanded with directions.

STEIGMANN, J., concurs.

APPLETON, P.J., specially concurring in part and dissenting in part.

PRESIDING JUSTICE APPLETON, specially concurring in part and dissenting in part:

I agree with the majority that the sentences on counts VIII and IX should run concurrently.  I respectfully dissent, however, from the majority's conclusion that the State proved count VI, a second offense of attempt (aggravated criminal sexual assault).

Defendant does not invoke the one-act, one-crime doctrine in his brief.  He does not argue that the State "carved [more than one offense] from the same physical act."  King, 66 Ill. 2d at 566, 363 N.E.2d at 844.  Nor does he argue that "with regard to multiple acts," he was "convicted of more than one offense, some of which [were], by definition, lesser[-]included offenses."  King, 66 Ill. 2d at 566, 363 N.E.2d at 844.  He merely argues the State failed to prove him guilty of a second offense of attempt (as opposed to only one offense of attempt).

The majority says:  "Just as multiple penetrations can support separate offenses of aggravated criminal sexual assault, multiple attempts to commit aggravated criminal sexual assault can support multiple convictions for attempt."  Slip op. at 12.  I agree that multiple attempts can support multiple convictions for attempt.  But that truism begs the question of whether by striking K.D. repeatedly with the board and commanding her to spread her legs, defendant did indeed commit more than one

- 27 -

offense of attempt, as that crime is defined in section 8-4(a) of the Criminal Code [Code] (720 ILCS 5/8-4(a) (West 2004)).

Attempt consists of two elements: (1) an intent to commit a specific offense, together with (2) an overt act constituting a substantial step toward the commission of the offense. 720 ILCS 5/8-4(a) (West 2004); Davis, 43 Ill. App. 3d at 614, 357 N.E.2d at 104-05. The majority reasons: "The multiple directions by defendant for K.D. to open up her legs and the multiple attempts to open K.D.'s legs so as to get the board inside K.D.'s vagina constitute sufficient evidence from which a rational trier of fact could find that defendant committed two offenses of attempt (aggravated criminal sexual assault)." Slip op. at 15. The way the majority loosely uses the word "attempt" invites confusion. At times, the majority uses the word to signify the offense of attempt, and at other times, it seems to use the word in its ordinary linguistic sense, to signify an act defendant took in his endeavor to commit aggravated criminal sexual assault. With the meaning of the term oscillating back and forth in this manner, the offense of attempt blurs into one of its elements, an overt act. I disagree with making the offense coextensive with one its elements, such that every overt act equals a separate attempt. For instance, in the sentence quoted in this paragraph, I disagree with the equation of defendant's "multiple directions" to K.D. with "multiple attempts" (under-

- 28 -

standing "attempt" as a statutorily defined offense).

Clearly, when defendant hit K.D. in the thighs, calves, and ankles with the board and commanded her to spread her legs, he did so with the intent of committing aggravated criminal sexual assault--or a trier of fact would be abundantly justified in so inferring. Thus, the element of intent was proved. Defendant continued to have that same intent while committing a series of overt acts (the second element): striking her again and again with the board and demanding that she expose her privates, evidently for penetration by the board. All of these acts were motivated by one intent. Surely, no one could plausibly suggest that in the brief intervals between blows, defendant ceased having the intent to commit aggravated criminal sexual assault and then quickly formed the intent again in time to deliver the next blow. He maintained that intent all along while wielding the board.

Here, then, is the question: If a defendant performs one substantial step and, a moment later, another substantial step, all the while having the same criminal intent, is each substantial step a separate offense of attempt? To this question, the majority really does not give an answer supported by relevant authorities; it merely answers "yes." As far as I can determine, no other court in Illinois has so interpreted the attempt statute (720 ILCS 5/8-4 (West 2004)) during the 45 years

- 29 -

it has been in existence.  Rather, Illinois courts have repeat-edly held that a single offense of attempt can encompass multiple acts.  People v. Woods, 24 Ill. 2d 154, 158, 180 N.E.2d 475, 478 (1962) ("an attempt does exist where a person, with intent to commit a specific offense, performs acts which constitute sub-stantial steps toward the commission of that offense" (emphasis added)); People v. Paluch, 78 Ill. App. 2d 356, 359, 222 N.E.2d 508, 510 (1966) ("The crux of the determination of whether the acts are sufficient to constitute an attempt really is whether, when given the specific intent to commit an offense, the acts taken in furtherance thereof are such that there is a dangerous proximity to success in carrying out the intent" (emphases added)); People v. Stevenson, 198 Ill. App. 3d 376, 383, 555 N.E.2d 1074, 1078 (1990) ("Attempt requires an intent to commit a specific offense and an act or acts constituting a substantial step toward the commission of the offense" (emphasis added)).

To my knowledge, only one case has held that each substantial step is a separate offense of attempt.  That case comes from Massachusetts--and, ironically, even it undercuts the majority's position.  In Commonwealth v. Dykens, No. 2005-393 (001-017), slip op. at ___ (September 7, 2005), 19 Mass. L. Rep. 730 (Mass. Super. Ct. 2005) (2005 WL 2220033 (Mass. Super.), *1; 2005 Mass. Super. LEXIS 413, *1) (hereinafter Dykens), a grand jury indicted Kenneth Dykens on three charges of attempted

- 30 -

breaking and entering.  According to the testimony in the grand-jury hearing, on February 10, 2005, at 2:30 a.m., Dykens tried to break into John and Jacqui Cram's house by (1) removing the screen from a window, (2) propping a ladder against the house, and (3) throwing a rock through a sliding glass door.  Dykens, slip op. at ___ (2005 WL 2220033 (Mass. Super.), *1; 2005 Mass. Super. LEXIS 413, *3).  For each of those three substantial steps, the grand jury indicted Dykens for a separate offense of attempt.  Dykens, slip op. at ___ (2005 WL 2220033 (Mass. Super.), *1; 2005 Mass. Super. LEXIS 413, *3).  Dykens moved to dismiss two of the three counts, along with the "corresponding habitual[-]offender charges," arguing that the three acts "constitute[d] only one continuing attempt to break [in]to the Cram[s'] house."  Dykens, slip op. at ___ (2005 WL 2220033 (Mass. Super.), *1; 2005 Mass. Super. LEXIS 413, *3).  The superior court denied his motion, reasoning as follows:

> "'Where a single statute is involved and
> the issue is whether two or more discrete
> offenses were proved under that statute
> rather than a single continuing offense, the
> question becomes whether the [l]egislature
> intended to authorize more than one convic-
> tion.' Commonwealth v. Decicco, 44 Mass.
> App. Ct. 111, 112[, 688 N.E.2d 1010] (1998)

- 31 -

(internal citations omitted); Commonwealth v. Levia, 385 Mass. 345, 347-51[, 431 N.E.2d 928] (1982). 'Ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' Commonwealth v. Donovan, 395 Mass. 20, 29[, 478 N.E.2d 727] (1985).

In this case, [section 6 of chapter 274 of the] General Laws *** is clear. It prohibits the 'attempt to commit a crime by doing any act toward its commission that fails in its perpetration[.]' [Mass. Gen. Laws ch. 274, §6.] If the legislature intended for a single attempt charge to cover all overt acts directed toward the commission of a single crime, it would have used the words 'any act or acts,' rather than 'any act.' 'It is a fundamental principle of statutory construction that "statutory language should be given effect consistent with its plain meaning and in light of the aim of the [l]egislature unless to do so would achieve an illogical result."' Commonwealth v. Hatch, 438 Mass. 618, 632[, 783 N.E.2d 393] (2003), citing Sullivan v. Brookline,

435 Mass. 353, 360[, 758 N.E.2d 110] (2001). Consequently, Indictments 003, 004, 005, and 006 must stand." Dykens, slip op. at ___ (2005 WL 2220033 (Mass. Super.), *2; 2005 Mass. Super. LEXIS 413, *3-4).

Like the Massachusetts statute, our attempt statute uses the term "any act": "[a] person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." (Emphasis added.) 720 ILCS 5/8-4(a) (West 2004). Illinois, however, also has a Statute on Statutes (5 ILCS 70/0.01 through 83 (West 2004)), section 1 of which provides: "In the construction of statutes, this Act shall be observed, unless such construction would be inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute." 5 ILCS 70/1 (West 2004). Section 1.03 provides: "Words importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular." 5 ILCS 70/1.03 (West 2004). By operation of sections 1 and 1.03 of the Statute on Statutes, "any act," in the Illinois attempt statute (720 ILCS 5/8-4(a) (West 2004)), means--to quote the Massachusetts court--"'any act or acts.'" From this alternatively singular or plural meaning, we should infer that "the legislature intended for a single attempt charge

to cover all overt acts directed toward the commission of a single crime" (Dykens, slip op. at ___ (2005 WL 2220033 (Mass. Super.), *2; 2005 Mass. Super. LEXIS 413, *4).  At the very least, the construction of "any act" as "any act or acts" creates an ambiguity in the attempt statute, which we should resolve in favor of lenity.  See People v. Davis, 199 Ill. 2d 130, 140, 766 N.E.2d 641, 647 (2002); Dykens, slip op. at ___ (2005 WL 2220033 (Mass. Super.), *2; 2005 Mass. Super. LEXIS 413, *4).

Two other two cases tend to deepen my reservations about the new-attempt-for-each-overt-act theory.  In Missouri v. Cox, 752 S.W.2d 855, 857 (Mo. App. 1988), the "defendant 'represented' Mary Blair in proceedings to obtain social security benefits."  In the form appointing him as her representative, he waived his right to a fee.  Cox, 752 S.W.2d at 857.  After she won her social security claim, he threatened to have her benefits terminated unless she compensated him for his services as her representative.  Cox, 752 S.W.2d at 857.  He made this threat to her on several different occasions, for which a jury convicted him of multiple counts of attempt to steal $150 or more by coercion (Mo. Rev. Stat. §564.011 (1986)).  He challenged five of these convictions on the ground of double jeopardy, arguing that "his five threats constituted a single act of attempted stealing and the individual threats were, at best, corroborative of his single intent to commit the crime of stealing.  To [the] defen-

- 34 -

dant, the intent and act were simply a continuing intent and continuing act." Cox, 752 S.W.2d at 859. The Court of Appeals of Missouri rejected his double-jeopardy challenge. The court reasoned as follows:

> "By this argument, [the] defendant would lead us into the quagmire of metaphysics. Did [the] defendant have one continuing intent, verbally manifested on separate days[,] or did he form a new intent manifested by each threat on each day[?] To avoid metaphysics, we resolve this kind of issue by determining whether there is an identifiable physical termination of the crime charged. [Citations.] We look to the time and place of commission of the conduct in question. Here [the] defendant's utterances took place on five different occasions. Each occasion was separated by at least one day. This physical separation as a matter of common sense implies a newly formed intent to commit the crime and a new step toward its commission rather than a single continuous intent and act. The word 'attempt' means to try. Here, on separate days, [the] defendant sim-

ply followed the old adage:  'If, at first,

you don't succeed, try, try again.'"  Cox,

752 S.W.2d at 859.

In the present case, by contrast, defendant committed the "substantial steps" (hitting K.D. with a board and commanding her to spread her legs) at the same time, in the same place, and in the same course of conduct.  There was no "identifiable physical termination" forming an interlude or dividing gap between separate offenses of attempt.

In United States v. Resendiz-Ponce, 549 U.S. ____, ____, 166 L. Ed. 2d 591, 595, 127 S. Ct. 782, 785 (2007), a jury convicted Juan Resendiz-Ponce, a Mexican citizen, of illegally attempting to reenter the United States (8 U.S.C. §1326(a) (2000)).  Because the indictment failed to allege "'any specific overt act that [was] a substantial step' toward the completion of the unlawful reentry," the Court of Appeals set aside the indictment as fatally flawed.  Resendiz-Ponce, 549 U.S. at ____, 166 L. Ed. 2d at 596, 127 S. Ct. at 786, quoting United States v. Resendiz-Ponce, 425 F.3d 729, 733 (9th Cir. 2005), rev'd, 549 U.S. ____, 166 L. Ed. 2d 591, 127 S. Ct. 782 (2007).  The Supreme Court reversed the court of appeals.  According to the Supreme Court, by alleging simply that Resendiz-Ponce attempted to reenter the United States, the indictment implicitly alleged the necessary overt act, for "attempt" implied an act, not merely

intent. Resendiz-Ponce, 549 U.S. at ____, 166 L. Ed. 2d at 597, 127 S. Ct. at 787.

Resendiz-Ponce maintained that the indictment would have been sufficient only if it had alleged any of three overt acts he performed when attempting to reenter the United States: that he walked into an inspection area, that he presented a misleading identification card, or that he lied to the inspector. Resendiz-Ponce, 549 U.S. at ____, 166 L. Ed. 2d at 598, 127 S. Ct. at 788. The Supreme Court responded:

> "Individually and cumulatively, those acts tend to prove the charged attempt--but none was essential to the finding of guilt in this case. All three acts were rather part of a single course of conduct culminating in the charged 'attempt.' As Justice Holmes explained in Swift & Co. v. United States, 196 U.S. 375, 396, [49 L. Ed. 518, 25 S. Ct. 276] (1905), '[t]he unity of the plan embraces all the parts.'" Resendiz-Ponce, 549 U.S. at ____, 166 L. Ed. 2d at 598-99, 127 S. Ct. at 788.

Then, in a footnote, the Supreme Court added:

> "Likewise, it would be unrealistic to suggest that [the] respondent actually com-

mitted three separate attempt offenses involving three different overt acts. Indeed, if each overt act were treated as a separate element, an attempt involving multiple overt acts might conceivably qualify for several separate offenses, thus perversely enhancing, rather than avoiding, the risk of successive prosecution for the same wrong." Resendiz-Ponce, 549 U.S. at ____ n.5, 166 L. Ed. 2d at 599 n.5, 127 S. Ct. at 788 n.5.

In the present case, it would be unrealistic to suggest that defendant committed a separate offense of attempt every time he commanded K.D. to spread her legs and every time he hit her with the board. If the State had charged him with aggravated assault in counts V and VI, each blow of the board would be a separate offense. Instead, the State charged him with attempt in those counts--an inchoate offense, a very different offense from assault. The policy behind the offense of attempt is to punish the dangerous proximity to the substantive offense (Paluch, 78 Ill. App. 2d at 359, 222 N.E.2d at 510), not, specifically, the substantial steps (which, absent the criminal intent, could be innocuous in themselves). Once the defendant takes a substantial step, he has crossed the threshold of dangerous proximity and becomes criminally liable. Treating a subsequent substantial

step as a new attempt would be tantamount to prosecuting him again for coming within dangerous proximity to commission of the same substantive offense (to which he already was in dangerous proximity, with resulting criminal liability). Subdividing an attempt into numerous miniattempts, one for each overt act, perversely enhances the risk of successive prosecution for the same wrong. Depending on the number of overt acts, a defendant could end up being punished more severely for attempting to commit a substantive offense than if he had actually committed the substantive offense. It is doubtful the legislature intended such an absurdity. I would reverse the conviction on count VI on the ground of insufficiency of evidence.