2020 IL App (1st) 172562-U

No. 1-17-2562

Order filed November 5, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 C5 50852 |
| | ) | |
| JOHN MILLER, | ) | Honorable |
| | ) | Colleen Ann Hyland, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HALL delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant procedurally forfeited his argument that the trial court improperly permitted the State to elicit certain testimony when he cannot establish plain error or ineffective assistance of counsel.

¶ 2    Following a jury trial, defendant John Miller was found guilty of three counts of predatory criminal sexual assault of a child (720 ILCS 5/12-14.1(a)(1) (West 2010)) and two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2010)). He was sentenced to a total of 21 years' imprisonment, comprising three consecutive 6-year prison terms for predatory

criminal sexual assault followed by 3 years' concurrent imprisonment for each count of aggravated criminal sexual abuse. On appeal, defendant contends that the trial court erred when it permitted the State to elicit evidence of a prior consistent statement which improperly bolstered a witness's testimony in a case where the outcome depended on witness credibility. We affirm.

¶ 3     Defendant's trial began on August 31, 2017. E.M. testified that defendant was her father and that she was 16 years old at the time of trial. She last saw defendant on November 10, 2015. Prior to that date, she and defendant had a close relationship. When E.M. was growing up, her parents took turns working night shifts, and she would nap or sleep with either or both of them.

¶ 4     On multiple occasions when E.M. was seven or eight years old something happened when she was napping with defendant. E.M. testified that, during the first incident, defendant raised her pajama shirt, rubbed her stomach and "chest area," put his finger down her pants, and touched her clitoral area. Defendant rubbed his finger back and forth, lowered her pants, and touched her clitoral area with his mouth. Defendant's penis was also against her clitoral area and vagina, but not inside, because she only felt pressure rather than pain. This contact was skin to skin. Defendant mumbled, but according to E.M., it seemed "like he was sleeping" because his eyes were closed and he did not speak. E.M. did not tell anyone what happened. She did not really know what "was happening," but knew it was "not an okay thing" and was scared. Although this did not happen every time E.M. napped with defendant, it happened multiple times. When E.M. was nine years old she asked a friend if her father touched her in a similar way and the friend said no. At this point, E.M. knew what was happening was "definitely wrong."

¶ 5     Another incident happened when E.M. was in third or fourth grade. On that day, she had plans to visit a friend. Defendant asked her to nap with him, and "the same thing happened as last

time." Specifically, defendant touched E.M.'s abdomen, chest, and clitoral area, defendant's penis made contact with her clitoral area, and defendant's mouth made contact with her clitoral area. Defendant's eyes were closed. Defendant unbuttoned E.M.'s jeans to put his hand into her underwear and pulled them down to "put his mouth there." Later, defendant entered the living room where E.M. was watching television or playing and asked if she was alright or if he had hurt her. She said no, and defendant sighed and went to bed.

¶ 6     During one incident before E.M. was 11, but when she was older than 7 or 8, defendant touched her abdomen, chest area, and clitoral area, and put his mouth on her clitoral area. E.M. also testified that during this incident, defendant pulled her into a hug, rolled onto his back so E.M. was on top of him, kissed her, then pushed her head down to his genitals. When E.M. tried to remove her mouth, defendant took her by the back of the head and pushed her "back down."

¶ 7     When E.M. was 11 or 12 years old, she was on her parents' bed with defendant and he touched her abdomen, chest, and clitoral area "just like every other time." Defendant was on top of E.M. when she reached over the side of the bed for defendant's pants which had his badge and firearm, pulled the "entire thing" onto the bed, and told defendant to get off her. Defendant "slowly backed away" and went back to sleep. She then got up and left the room. After that day, E.M. started saying no when defendant asked her to take a nap. When defendant would pull her onto his chair or start rubbing her abdomen, she would move to sit elsewhere, and say no or that she had to do homework.

¶ 8     In early 2015, E.M. met Alexis and they became best friends. During a phone call, E.M. told Alexis what happened between her and defendant and asked Alexis not to tell anyone. In fall 2015, there was "teenage drama" which made E.M. feel angry and betrayed, so she made an

appointment to talk to Marist High School guidance counselor Margaret Reif. When E.M. met with Reif on November 10, 2015, E.M. did not intend to tell Reif what happened with defendant. During their conversation, however, E.M. said she was scared because Alexis knew a secret. When Reif asked about the secret, E.M. said "my dad raped me when I was younger." The words "just kind of came out." Although E.M. thought the meeting was confidential, Reif said that she had to call the police and that people would talk to E.M. during lunch the following day. When defendant drove her home, E.M. did not tell him what had happened; rather, she decided to "deal with it" the next day.

¶ 9 That evening, personnel from the Department of Children and Family Services (DCFS) came to E.M.'s home. E.M.'s mother "freak[ed] out" because DCFS personnel wanted them to leave the house. Defendant was not home. As E.M. and her mother entered a vehicle, E.M. was crying and her mother kept asking what was happening. E.M. told her mother that "dad raped me." E.M. was separated from her mother at a police station. The following day, E.M. went to the All Our Children's Advocacy Center where she was interviewed. She also underwent a physical examination at a hospital. E.M. stayed with her aunt for several weeks but was then allowed to go home. E.M. did not tell anyone what happened with defendant sooner because she was scared, did not want to lose her father, and did not think anyone would believe her.

¶ 10 During cross-examination, E.M. acknowledged that while she tried to not be alone with defendant in the house, she still went on motorcycle rides with him because she thought nothing would happen on the motorcycle or when they were out together. She did not recall telling her parents she would meet with Reif.

¶ 11    When E.M. spoke to Reif, she mentioned the occasion when she reached for defendant's pants and also told Reif something about the firearm. E.M. then testified that she told Reif that during that incident, she grabbed the firearm, pointed it at defendant, and told him to get off her. E.M. explained that she did not remember much of that incident, but recalled grabbing the pants and knew there must have been a firearm because the pants were heavy and she pointed "it" at him. However, she also realized her memory of the incident "doesn't make sense." E.M. agreed with trial counsel that she told Reif she grabbed the firearm and pointed it at defendant in order to get defendant to stop. E.M. next testified that she did not actually pull the firearm out, but when she spoke to Reif she remembered thinking that she did. Since speaking with Reif, E.M. had been in therapy "figuring out what really happened."

¶ 12    Reif testified that she spoke with E.M. on the afternoon of November 10, 2015. E.M. was initially happy and smiling, but during the conversation became withdrawn, tearful, and said something about defendant. The State asked what E.M. said, and the defense made a hearsay objection.

¶ 13    During a sidebar, the State argued that the relevant testimony was not hearsay because it was not offered for the truth of the matter asserted, but to explain Reif's actions as a mandated reporter. In other words, certain types of information required Reif to break confidentiality and notify authorities. The State also noted that trial counsel cross-examined E.M. about what she said or did not say to Reif.

¶ 14    The trial court noted that E.M. had already testified to the statement, trial counsel had the opportunity to cross-examine E.M. about what she said, and the jury had already heard the evidence. The court noted that Reif had to do "something" as a result of the conversation. The

court found the statement "admissible *** not as hearsay—not being offered for the truth of the matter asserted, but being offered as to what actions the witness took." The court reiterated that it was allowing the statement "that the father raped her," not for the truth of the matter asserted, but to show that Reid had to take some action as a result. The defense did not request a limiting instruction.

¶ 15    Back in the presence of the jury, the State asked Reif what E.M. said about defendant. E.M. told Reif that her father started raping her when she was 7 years old and that it continued until she was 12 years old. E.M. also stated that she reached for his firearm. After this conversation, Reif went to a coworker's office because she was a mandated reporter. Per DCFS instruction, she also called the police. After telling E.M. that she would call DCFS, E.M. became very tearful and said she was afraid she ruined her family. During cross-examination, Reif acknowledged that as a mandatory reporter, the mere suspicion of abuse triggered the obligation to report.

¶ 16    Marist High School Dean of Academics for Underclassmen Joseph Inzinga testified that he met E.M.'s parents on October 16, 2015, during a parent-teacher conference evening. Defendant expressed concern about the Wi-Fi system and difficulties communicating with E.M. regarding end-of-the-day pickup. Defendant did not want E.M. removed from class to visit a counselor and wanted to be notified ahead of time. Inzinga explained that visits to the guidance counselor were part of the routine in high school and parents must sign a form to permit visits. During cross-examination, Inzinga stated that E.M. attended counseling during the school day.

¶ 17    Nurse practitioner Kimberly Souder testified that she was a board-certified sexual assault examiner and examined E.M. on November 11, 2015. E.M. had a normal physical and genital exam. Souder testified that it was not unusual for an adolescent patient with a claim of sexual

abuse to have a normal exam depending on her age and the length of time between the last incident of abuse and the exam. A normal exam does not rule out sexual abuse or prior penetration, especially during puberty in females, because estrogen allows the hymen to be elastic.

¶ 18    Sounder testified that "late disclosure" was very common in cases of child sexual abuse. Because over 90% of perpetrators are family members and are usually respected within the family, children are often afraid to disclose abuse for fear of disrupting the family unit or not being believed. Souter also opined that perpetrators usually do not intend to cause physical harm and want to maintain secrecy.

¶ 19    The State then admitted, without objection, defendant's and E.M.'s birth certificates. Defendant's date of birth was June 30, 1964, and E.M.'s date of birth was January 16, 2001.

¶ 20    Defendant testified that he had been married for 17 years, suffered from erectile dysfunction for more than 12 years, and previously worked as a police officer. E.M. was an only child, and although raising a child was "difficult," he strived to be the best parent he could. Defendant denied any inappropriate contact with E.M. and believed they had a "very good" relationship. Although he and his wife permitted E.M. to express herself, E.M. had problems "fitting in" because she was an advocate for gay rights at her Catholic school. E.M.'s problems began in second grade, but the biggest issues were in middle school and continued into high school. Defendant approached Inzinga because technology issues meant E.M. was unable to turn in homework and contact her parents to coordinate pick up times. During cross-examination, defendant acknowledged that he worked for the local police department and was home alone with E.M. when he and his wife worked opposite shifts.

¶ 21    During closing argument, the State argued that E.M. testified credibly about what defendant did, like other children she kept it a secret, and she only told Reif that defendant "rap[ed] her between the ages of 7 and 12 years old" because she had told Alexis. The defense responded that E.M. was not believable and her "story" had changed from the initial accusation. The trial court's instructions to the jury did not include a limited use for hearsay evidence.

¶ 22    During deliberations, the jury sent a note stating that it was "11 to 1" and "the one will not be changing his mind." The trial court noted that the jury had been deliberating for less than three hours, and sent a response stating that the jury had the law and instructions and asking it to continue to deliberate. The jury ultimately found defendant guilty of all counts.

¶ 23    Defendant filed a motion for a new trial, which did not challenge Reif's testimony regarding E.M.'s statement. The motion was denied. After hearing argument, the trial court sentenced defendant to three consecutive 6-year prison terms for predatory criminal sexual assault followed by 3 years' concurrent imprisonment for each count of aggravated criminal sexual abuse for a total of 21 years in prison.

¶ 24    On appeal, defendant contends that the trial court erred when it permitted the State to elicit evidence of E.M.'s prior consistent statement to Reif. Defendant notes that there was no charge of recent fabrication or motive to lie on the part of E.M., the statement was not necessary to explain Reif's course of conduct, and the testimony improperly bolstered E.M.'s credibility in a case where the outcome rested "entirely" on whose testimony the jury believed. He further argues that the trial court erred when, after ruling that the proposed testimony was admissible, it permitted Reif to testify as to the substance of the conversation when Reif should only have been permitted to testify regarding her actions resulting from the conversation.

¶ 25 The State first responds that defendant generally objected to the complained-of testimony as hearsay before the trial court and is improperly attempting to raise a new theory on appeal, namely that the complained-of testimony was inadmissible specifically because it was a prior consistent statement. The State further contends that the complained-of testimony was not hearsay because it was offered to explain Reif's actions, likening her testimony to that of a police officer testifying regarding the steps of an investigation. Defendant responds that a prior consistent statement is inadmissible hearsay unless an exception applies, and so trial counsel properly objected to the proposed testimony as inadmissible hearsay and the trial court erred when it overruled the objection.

¶ 26 The record reflects that trial counsel made a general hearsay objection and the State responded that the proposed testimony was offered to explain Reif's actions as a mandated reporter rather than for the truth of the matter asserted. Trial counsel did not challenge Reif's testimony on the basis that it would elicit a prior consistent statement. Thus, this specific argument was never presented to the trial court and the trial court was not given the opportunity to determine the admissibility of the evidence on that basis. See *People v. Hughes*, 2015 IL 117242, ¶ 46 (by not raising claims in the trial court, the defendant deprived "the State of the opportunity to challenge them with evidence of its own," and "the trial court of the opportunity to decide the issue on those bases," and this court "of an adequate record to make these determinations"). Rather, the trial court determined that the proposed testimony was not hearsay and therefore admissible. As the trial court never specifically considered whether the proposed testimony was inadmissible as a prior consistent statement, we decline defendant's invitation to do so for the first time on appeal.

¶ 27 Notwithstanding, defendant asks this court to review his claims on appeal pursuant to the plain error doctrine because the admission of E.M.'s prior consistent statement improperly boosted her credibility when the evidence at trial was closely balanced and the outcome depended upon whose version of events the jury believed. In the alternative, defendant contends that he was denied the effective assistance of trial counsel when counsel failed to include this claim in a posttrial motion.

¶ 28 The plain error doctrine permits a reviewing court to address a forfeited claim where a "clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Hood*, 2016 IL 118581, ¶ 18. The defendant bears the burden of persuasion in establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43. We first consider whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 29 Hearsay is generally inadmissible at trial. Ill. R. Evid. 802 (eff. Jan. 1, 2011); *People v. Williams*, 238 Ill. 2d 125, 143 (2010). "Hearsay is an out-of-court statement offered to establish the truth of the matter asserted and testimony about an out-of-court statement which is used for a purpose other than to prove the truth of the matter asserted in the statement is not hearsay." (Internal citations omitted.) *People v. Banks*, 237 Ill. 2d 154, 180 (2010). "The fundamental reason for excluding hearsay is the lack of an opportunity to cross-examine the declarant." *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004). Even when a declarant testifies, prior consistent statements of the declarant are inadmissible to corroborate the declarant's trial testimony because they serve to

unfairly enhance the declarant's credibility. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. A statement offered for its effect on the listener or to explain the subsequent course of conduct of another, however, is not hearsay. *People v. Carroll*, 322 Ill. App. 3d 221, 223 (2001).

¶ 30    We review the trial court's evidentiary ruling on whether to admit particular testimony for an abuse of discretion. *People v. Tenney*, 205 Ill. 2d 411, 436 (2002). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 31    The record reveals that in overruling trial counsel's objection, the trial court determined that Reif's proposed testimony that E.M. stated that her father raped her was not hearsay because it was not offered for the truth of the matter asserted. Rather, it was offered to explain Reif's subsequent conduct. In other words, only certain information would cause her to act as she did. Thus, the proposed testimony was not offered to prove the truth of E.M.'s statement, but rather the effect the statement had on Reif. See *Carroll*, 322 Ill. App. 3d at 223 ("statements offered for their effect on the listener or to explain the subsequent course of conduct of another are not hearsay"). The effect shown here was that after E.M. stated that her father raped her, Reif broke confidentiality and contacted DCFS. Thus, the testimony showed Reif's course of conduct. As such, the trial court did not abuse its discretion in determining that the proposed testimony did not qualify as hearsay and was properly admissible.

¶ 32    Defendant further argues that the trial court erred because it permitted Reif to testify as to the substance of the conversation, rather than what she did as a result of the conversation.

¶ 33    In the case at bar, the trial court could have, in the exercise of its discretion, determined the jury would have been adequately informed regarding how the case entered the justice system based on Reif's testimony that she contacted DCFS following her conversation with E.M. In that situation, however, the jury could readily have concluded that the content of the conversation concerned alleged sexual abuse, given that immediately following the conversation Reif contacted DCFS. The jury, therefore, could have readily inferred the same facts that the court permitted the witness to state expressly. Under these circumstances, we cannot say the trial court abused its discretion in admitting Reif's testimony that E.M. said her father raped her order to explain Reif's subsequent course of conduct. See *People v. Witherspoon*, 379 Ill. App. 3d 298, 310 (2008) (upholding a trial court's finding under abuse of discretion standard of review does not necessarily mean an opposite finding would be an abuse of discretion).

¶ 34    Having determined that the trial court did not abuse its discretion when admitting the complained-of testimony, we find that defendant cannot demonstrate that the trial court committed a clear or obvious error. *Eppinger*, 2013 IL 114121, ¶ 19. Absent error, there can be no plain error, and defendant's procedural default will therefore be honored. See *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007).

¶ 35    In the alternative, defendant contends that he was denied the effective assistance of counsel when, although counsel objected to the complained-of testimony, counsel failed to preserve this issue for appeal by including it in a posttrial motion.

¶ 36    A successful ineffective assistance of counsel claim demonstrates "that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). Having determined that the trial court did not abuse its discretion when admitting the complained-of testimony, any renewed objection by trial counsel would have been futile. See *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 33 ("Necessarily, counsel cannot be deemed ineffective for failing to raise an objection to admissible evidence—such an objection would be futile."). Therefore, defendant's claim of ineffective assistance of counsel must fail. See *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010) ("It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection.").

¶ 37    For the forgoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 38    Affirmed.