NOTICE
Decision filed 07/01/19. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2019 IL App (5th) 160035

NO. 5-16-0035

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 15-CF-228 |
| | ) | |
| RASHEED CASLER, | ) | Honorable |
| | ) | Kimberly L. Dahlen, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE OVERSTREET delivered the judgment of the court, with opinion.
Justices Chapman and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Rasheed Casler, appeals his November 10, 2015, conviction, following a jury trial in the circuit court of Jackson County, which found him guilty of obstructing justice in violation of section 31-4(a) of the Criminal Code of 2012 (720 ILCS 5/31-4(a) (West 2014)). He was sentenced on January 20, 2016. For the following reasons, we affirm.

¶ 2                                    FACTS

¶ 3    On June 23, 2015, the defendant was charged by information with, *inter alia*, obstructing justice (*id.*).[1] The information alleged that the defendant knowingly, with the intent to prevent his arrest on warrants, provided false information to Sergeant Guy Draper by telling him that his name was Jakuta King Williams. A jury trial was held on November 9 and 10, 2015. Our

_____

[1]The defendant was charged with two additional offenses that are not part of this appeal.

recitation of the evidence presented at trial is limited to that which is relevant to obstructing justice—the only charge at issue on appeal.

¶ 4    Guy Draper testified that he is employed as a sergeant with the Carbondale Police Department. After summarizing his curriculum vitae, Draper testified that some of his duties include supervising the midnight shift from 10:30 p.m. through 8:30 a.m. During the midnight shift on March 6, 2015, Draper was on duty, conducting foot patrols at various hotels throughout Carbondale. At 12:45 a.m. on that date, he and Officer Blake Harsy were both in uniform and on foot patrol at Quality Inn. Draper testified that, while patrolling the hallway of the second floor, Harsy "was just a little bit behind me." As they approached room 210, the door opened quickly, and Draper observed "a black male emerge from the hotel room, look at me, pause for a second, and then slam the door and go back into the room." Draper noticed that the man was wearing a green hoodie. Draper testified that he "recognized him as being someone I had dealings with prior" but "it was just a brief window" so he "wasn't sure who it was." Draper identified the defendant as the individual who opened the door of room 210.

¶ 5    Draper testified that, when the door slammed shut, Harsy smelled the odor of burnt cannabis emerging from the hotel room. Draper approached the door and immediately noticed the odor as well. Draper testified that he knocked on the door and, after about five seconds, a female later identified as Brianna Wyatt opened the door. Draper noticed the smell of cannabis was stronger at that point, but he did not enter the room immediately. From his vantage point in the doorway, Draper observed the layout of the room, which he described as a "typical hotel room." Draper saw two males in the room, one on each bed and both of whom he instantly recognized, and two females seated in opposite corners of the room, neither of whom he recognized. The males were identified as Torrion Creer and Desmine Schauf and the females as Brianna Wyatt—who had opened the door—and Shanique Lincoln. Draper requested additional

officers for backup when he realized how many people were in the room. He stated that Creer, Schauf, and Wyatt were "real interested [*sic*] in leaving the room" but he did not allow them to do so.

¶ 6        Draper testified that his attention was directed to the bathroom because he did not see the defendant in the hotel room and the bathroom door was closed. Draper explained that he previously witnessed people in hotel rooms hide in the bathrooms because they "have warrants or probable cause for their arrest" or they sometimes go to the bathrooms "to seek refuge[,] to attempt to destroy evidence[,] or hide stuff." Draper testified that, when he did not see the defendant in the hotel room, he directed his attention toward the bathroom door. Draper explained that he was still standing in the hotel room doorway during this time and he knocked on the opened hotel room door—not the bathroom door—and identified himself as a police officer before addressing the person in the bathroom as follows: "Anybody in the bathroom, identify yourself."

¶ 7        Draper testified that the defendant responded in so many words that he was defecating. Draper again commanded the defendant to identify himself, and the defendant responded that his name was Jakuta King Williams. When Draper asked the defendant for identification, the defendant replied that he had no identification but said that he was from Virginia. Draper testified that Officer Harsy relayed the name Jakuta King Williams to the dispatch center but no record of any such person was found. Draper indicated that the defendant initially fooled him by giving him the false name.

¶ 8        Draper testified that he ordered the defendant to open the door so he could see him and know what he was doing. Draper also told him that if he flushed the toilet Draper would come into the bathroom and seize him. Draper explained that, if the toilet flushed, he would assume that the defendant was trying to get rid of whatever he did not want Draper to find. Draper

3

testified that, because of the odor of cannabis in the hotel room, he thought the defendant was attempting to hide cannabis in the bathroom. Draper testified on cross-examination that he did not hear the defendant flush the toilet and, as far as Draper knew, the defendant did not try to destroy any evidence while in the bathroom.

¶ 9    Draper informed the defendant that the officers were not leaving until they confirmed his identity. Draper testified that when the defendant emerged from the bathroom he had a chance to look at him for a period of time and recognized him because he had previously arrested him. When he recognized the defendant, Draper asked him, "Are you sure you're not Rasheed Casler?" Draper testified that the defendant did not respond and at that point "he stopped looking at me." Draper noted that the defendant was not wearing the green hoodie when he emerged from the bathroom.

¶ 10    One of the officers relayed the name Rasheed Casler to the dispatch center, which alerted that the defendant had an outstanding warrant. Accordingly, Draper arrested the defendant. Draper conceded on cross-examination that, once he realized there was a warrant on the defendant, nothing interfered with his ability to apprehend him, nor did the defendant attempt to fight him or run from him. Draper testified that, when he looked in the bathroom after the defendant emerged, he observed toilet paper in the toilet but did not see any human waste or contraband. When asked if the defendant was drunk when he encountered him, Draper replied, "I don't know. I don't think so."

¶ 11    Draper testified that the registered tenant of the hotel room eventually arrived and consented to a search of the room. Draper participated in the search, located a green hoodie lying on the far bed, and confirmed that it was the one the defendant was wearing when he opened the hotel room door and stepped into the hallway. Draper testified that he stood by as Sergeant

4

David Kemp searched the hoodie and discovered in the pocket, *inter alia*, a wallet containing the defendant's Illinois identification card bearing the name Rasheed Casler.

¶ 12    Shanique Lincoln testified that she was with the defendant in the hotel on the date in question. She recalled the defendant opening the hotel room door and going to the bathroom afterwards, but she could not recall if the defendant was wearing a green hoodie when he opened the door because she was "under the influence" from drinking tequila and smoking marijuana and could not remember many details. Lincoln agreed that she spoke to a police officer and submitted a written statement but qualified that she "felt forced, pushed into it" because she was arrested that night for possession of cannabis and she felt frightened and threatened. Lincoln's statement was published to the jury, over objection. She asserted in the statement, *inter alia*, that the defendant "looked out the door and said wo [*sic*] and closed the door."

¶ 13    David Kemp testified that he is employed as a sergeant with the Carbondale Police Department. He reported that he was present at Quality Inn on March 6, 2015, a little before 1 a.m. and conducted a search of room 210. During the search, he located a green hoodie, in which he discovered, *inter alia*, a wallet containing an Illinois driver's license bearing the name Rasheed Casler. Kemp confirmed that Draper was standing right beside him during the search "[a]nd as I pulled those items out of the pocket of the hooded sweatshirt, I laid them on the bed to be photographed, and then I handed those items over to Sergeant Draper right there in the room."

¶ 14    Blake Harsy testified that he is employed as a patrol officer for the Carbondale Police Department. He testified that he was conducting a foot patrol with Draper on the second floor of Quality Inn at 12:45 a.m. on March 6, 2015, when he heard the door of room 210 open and observed a black male in a green hoodie step into the hallway. Harsy testified that the subject

5

"saw us in uniform, looked right at Sergeant Draper[,] and retreated into the room and shut the door." Harsy identified the defendant as the man he observed in the hallway.

¶ 15    Harsy testified that, as the door of room 210 closed, he smelled the odor of burnt cannabis. Accordingly, he informed Draper, who walked to the door and also smelled it. Harsy indicated that Draper knocked on the door and a female—later identified as Brianna Wyatt— opened the door less than a minute later. At that time, Harsy observed "a few different people sitting on beds" and one person sitting in a chair. He testified that he "could see visible smoke just wafting in the middle of the room." Harsy did not see the defendant in the hotel room. He described the room as approximately 20 by 25 feet, with the bathroom door located a couple feet away from and directly to the right of the entry door.

¶ 16    Harsy testified that, when Brianna Wyatt answered the door, he asked her to step into the hallway to speak to him. Although Wyatt initially claimed to be the registered tenant of the hotel room, Harsy learned from her that the actual registered tenant had left. Harsy noted that Draper was standing in the hallway "talking through the opened door to the people that were sitting in the room."

¶ 17    At some point, Harsy went downstairs to speak to the manager on duty and learned the name of the registered tenant. He returned to room 210 less than 10 minutes later, observed several officers standing in front of the door, and heard a "hit tone." Harsy explained that, when a name is run by dispatch through the database, "there's a certain tone on the radio to let officers know that the person has a warrant." Harsy continued, "[S]o when I returned to the room, I heard that over the radio and I saw officers entering the room and taking [the defendant] into custody." Harsy testified that he entered the hotel room, checked the bathroom, and observed human waste in the toilet. He confirmed that no contraband was found in the bathroom.

6

¶ 18   The defendant testified that he arrived at Quality Inn on the date in question "a little bit after 12, I want to say." He stated that he was intoxicated upon arrival because he had been drinking tequila. He went to room 210 because his friends, Torrion Creer, Desmine Schauf, Brianna Wyatt, and Shanique Lincoln, were there. The defendant testified that he continued to drink tequila after he was inside room 210 and "I was feeling queasy after I took that last shot and I really couldn't hold it down, so I got up to run to the bathroom and I opened the wrong door" into the hallway. The defendant testified that he "didn't step outside, just opened the door and shut it," then went to the bathroom. He denied seeing any police officers in the hallway.

¶ 19   The defendant identified People's exhibit 2 as the green hoodie that he was wearing on the night in question. He testified that he was sweating before he went to the bathroom and "I was going to vomit everywhere and I was hot, so I took it off" and "I tossed it on the bed." The defendant testified that when he entered the bathroom he closed the door and began having diarrhea. While using the bathroom the defendant heard somebody ask, "Who's in there?" He testified that he thought it was one of his buddies "messing around with me while I was using the bathroom," so he replied, "Jakuta King Williams." He reiterated on cross-examination that he did not know there were officers outside the bathroom door when he shouted that his name was Jakuta King Williams.

¶ 20   The defendant testified that he was not attempting to avoid being arrested by giving the false name. He denied telling Draper that he did not have any identification because "I had my wallet." He testified that he is, in fact, from Portsmouth, Virginia. He stated that he did not know that there was a warrant for his arrest at the time, he did not enter the bathroom to avoid arrest, and it was not his intent to flush any contraband while in the bathroom. The defendant testified that after he heard someone ask, "[w]ho's in there," he was told to open the door "and that's when I knew it was the police." The defendant testified that he opened the door while still seated

on the toilet and when the door opened he recognized Draper, who had arrested him in June 2013.

¶ 21    The defendant testified that Draper instructed him not to flush the toilet. The defendant confirmed that Draper also recognized him and called him by name. After the defendant finished using the bathroom, he exited without flushing the toilet, and Draper arrested him. The defendant testified that his wallet containing his identification was in the hoodie that he had tossed on the bed. On, November 10, 2015, the jury found the defendant guilty of obstructing justice.

¶ 22                                      ANALYSIS

¶ 23    The sole issue on appeal is whether the State proved beyond a reasonable doubt that the defendant obstructed justice. "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. "[A] criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Id.*

¶ 24    We are mindful that under a challenge to the sufficiency of the evidence, " 'a reviewing court must allow all reasonable inferences from the record in favor of the prosecution.' " *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007) (quoting *People v. Bush*, 214 Ill. 2d 318, 326 (2005)). "This standard of review applies in cases whether the evidence is direct or circumstantial." *Id.* " 'When weighing the evidence, the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt.' " *Id.* (quoting *People v. McDonald*, 168 Ill. 2d 420, 447 (1995)). "It is not the function of this court to retry the defendant." *People v. Rendak*, 2011 IL App (1st) 082093, ¶ 29. "Instead, it falls upon the trier of fact to judge the

credibility of witnesses, resolve conflicts in the evidence, and draw conclusions based on all the evidence." *Id.*

¶ 25 Section 31-4(a) of the Criminal Code of 2012 provides, in relevant part: "A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution *** of any person, he *** knowingly commits any of the following acts: (1) *** furnishes false information ***." 720 ILCS 5/31-4(a)(1) (West 2014). Here, the information charged the defendant with obstructing justice, in that he knowingly and with the intent to prevent his arrest on warrants, provided false information to Sergeant Draper by identifying himself as Jakuta King Williams.

¶ 26 The defendant contends that his intent to prevent his apprehension was not proven and compares this case to *People v. Jenkins*, 2012 IL App (2d) 091168. In that case, an officer approached the defendant, David E. Jenkins, at his home and stated that he was looking for "a David Jenkins" as part of an investigation of a minor traffic accident. *Id.* ¶ 4. The defendant advised that he was David Jenkins. *Id.* The officer testified that he expected Jenkins to be younger and asked if there was a "Junior David Jenkins," to which the defendant responded in the negative. *Id.* The officer stated that he then asked the defendant if he had a son named David Jenkins and, after a negative response, he asked the defendant if he had a son named David Jenkins who drove a white Mustang. *Id.* The officer testified that the defendant again said that he did not. *Id.* After another officer approached, the defendant admitted that he did, in fact, have a son named David Jenkins whose mother owned the Mustang. *Id.* ¶ 5. The defendant was arrested for obstructing justice. *Id.*

¶ 27 The defendant in *Jenkins* testified that, when the officer asked for David Jenkins, he replied that he was David Jenkins and, when asked if he owned a white Mustang, he replied that his son did. *Id.* ¶ 12. The defendant testified that, when he was asked if his son went by "Junior,"

9

he responded that his son goes by "David Theodore Jenkins." *Id.* The *Jenkins* court held that the evidence was insufficient to support the guilty verdict because the officer did not inform the defendant that he was looking to arrest the younger Jenkins or otherwise apprehend him. *Id.* ¶ 27. Accordingly, the defendant was unaware that a prosecution or apprehension was involved, so he could not have had the intent to avoid either. *Id.* Here, the defendant concedes that he provided false information but compares this case to *Jenkins* because he contends that, here, the State did not prove beyond a reasonable doubt that he obstructed justice because there is no proof that he intended to prevent his apprehension because he did not know he was subject to arrest. We disagree.

¶ 28    "Intent can rarely be proved by direct evidence because it is a state of mind." *People v. Witherspoon*, 379 Ill. App. 3d 298, 307 (2008). "Instead, intent may be inferred from surrounding circumstances and thus may be proved by circumstantial evidence." *Id.* In this case, the defendant argues that, "since he was not aware of a danger of arrest, he could not try to prevent it." To support his argument, he cites his testimony that he was unaware that he had any warrants and the police never identified themselves when asking who was in the bathroom. He contends that he was under the impression that his friends were joking around with him on the other side of the bathroom door and that he gave the false name to go along with the joke. He denied seeing any police officers in the hallway, denied entering the bathroom to avoid arrest, denied ever saying that he had no identification, and testified that he did not know the police were present until after he was told to open the bathroom door.

¶ 29    Conversely, the State presented evidence from which a rational jury could conclude that the defendant knew the police were present before he entered the bathroom and that he provided the false name with the intent to prevent his apprehension. Sergeant Draper and Officer Harsy both testified that they were in uniform when they observed the defendant emerge from the hotel

10

room, look at Draper, pause, then retreat back into the room, slamming the door behind him. Eye contact with the uniformed Draper implies that the defendant knew the police were present. Moreover, Shanique Lincoln indicated in her statement that the defendant looked out the hotel room door and said, "Whoa," before coming back in and closing the door. The jury could infer from these facts that the defendant was caught by surprise by seeing the officers in the hallway.

¶ 30    Besides Lincoln's statement and the testimony of the officers that the defendant saw them in uniform, additional evidence from which a jury could conclude that the defendant knew the police were present before he gave the false name is Draper's testimony that he identified himself as a police officer before addressing the defendant in the bathroom. The defendant obviously heard Draper because he responded that he was using the bathroom. When Draper commanded the defendant to identify himself, the defendant replied with the false name of Jakuta King Williams. When Draper asked for identification, the defendant claimed to have none, although his identification was later discovered in the green hoodie during the search of the room.

¶ 31    Notwithstanding the defendant's testimony that he was merely joking with his friends and did not know the police were present when he gave the false name, it is the duty of the jury—not of this court—to resolve conflicts between testimony and determine credibility of witnesses. See *Rendak*, 2011 IL App (1st) 082093, ¶ 29. Here, the defendant contends that "nothing in the record suggests he knew of the warrant." We disagree. No contraband was discovered in the bathroom, and the defendant did not flush the toilet. A reasonable inference flowing from these facts (see *Saxon*, 374 Ill. App. 3d at 416) is that the defendant retreated to the bathroom and provided the false name in an attempt to avoid arrest—not because he had anything to hide—but because he knew about the warrant. Nonetheless, the defendant testified that he entered the bathroom because he was sick—not to hide from the officers or to avoid arrest. Although Draper

11

testified that he observed only toilet paper and no human waste in the toilet, Harsy testified that he observed human waste in the toilet. Again, the jury resolves the inconsistencies between testimonies and determines the credibility of witnesses. See *Rendak*, 2011 IL App (1st) 082093, ¶ 29.

¶ 32 Additionally, Draper testified that the defendant did not respond and stopped looking at him when Draper asked if he was Rasheed Casler. There is ample evidence from which the jury could conclude that the defendant saw the police outside the hotel room and entered the bathroom to hide. Inferences as to a defendant's mental state are particularly within the province of the jury (see *People v. Rodriguez*, 2014 IL App (2d) 130148, ¶ 56), and evidence of flight is evidence of a defendant's knowledge (see *People v. Whitfield*, 214 Ill. App. 3d 446, 454 (1991)).

¶ 33 We find that the jury could infer by the surrounding circumstances and thus prove by circumstantial evidence that the defendant intended to avoid apprehension and provided the false name to Draper in an effort to do so (see *Witherspoon*, 379 Ill. App. 3d at 307), unlike *Jenkins*, where there was insufficient evidence that the defendant was trying to prevent the apprehension or obstruct the prosecution of his son because he was unaware of any potential apprehension or prosecution (see 2012 IL App (2d) 091168, ¶ 27). When looking at the evidence in a light most favorable to the prosecution and allowing all reasonable inferences to be resolved in the prosecution's favor (see *Brown*, 2013 IL 114196, ¶ 48; see also *Saxon*, 374 Ill. App. 3d at 416), we find that a rational jury could conclude that the defendant obstructed justice because he had the requisite intent to avoid apprehension and gave the false name to further that intent.

¶ 34 The defendant also cites *People v. Childs*, 272 Ill. App. 3d 787 (1995), to illustrate how intent can be inferred. In *Childs*, the defendant was convicted of obstructing justice after falsely telling police that he did not know Carlos, the murder suspect, when Carlos was hiding under a bed a few feet from the defendant. *Id.* at 788-89. The appellate court affirmed the defendant's

conviction after finding that the evidence showed that the defendant made the false statement for the purpose of preventing Carlos's apprehension. *Id.* at 791, 796.

¶ 35    The defendant attempts to distinguish *Childs*, stating that in that case, "there could be no mistake that he was talking to an officer: they were questioning him while he was on his knees with a shotgun pointed at him," (see *id.* at 788-89) but, "[h]ere, the police were merely inquiring as to whom [*sic*] was in the bathroom, not even knowing [the defendant] had an outstanding warrant once identified." We agree with the State that the differing circumstances between this case and *Childs* are irrelevant because—as previously discussed—there is sufficient evidence in this case from which the jury could reasonably infer that the defendant knew he was speaking to the police through the bathroom door and that he gave the false name to prevent his apprehension.

¶ 36    The defendant further contends that the false information provided by the defendant in *Childs* could have impaired or delayed the search for Carlos had the police not found him, while the information here presented no such risk because the police were not leaving until they confirmed the defendant's identity. We disagree. Draper testified that he was initially fooled by the false name. As aptly noted by the State, if the police had believed the defendant's story that he was Jakuta King Williams and not inquired further, they would not have discovered his true identity and that he was the subject of a warrant, just as, if the police in *Childs* had believed the defendant's story, they might not have found Carlos hiding under the bed. Moreover, notwithstanding the false information given in *Childs*, the police had already been authorized to search the premises where Carlos was hiding, so their discovering his whereabouts was inevitable, thereby discrediting the defendant's argument that the false information given in *Childs* could have impaired or delayed the search for Carlos.

13

¶ 37    Finally, the defendant argues that—even if we conclude that the evidence supported a finding that he possessed the requisite intent to prevent his apprehension—the totality of the evidence is insufficient to affirm his conviction because his giving the false name did not materially impede the administration of justice. He cites *People v. Taylor*, 2012 IL App (2d) 110222, to support this argument. In *Taylor*, the defendant was crossing a street when he was approached by a police officer who recognized him as Donnell Taylor because he had previously arrested him. *Id.* ¶ 3. The officer was aware that the defendant was wanted on a warrant and the defendant's photo was on the visor of the squad car, along with photos of other individuals with outstanding warrants. *Id.* A record check was run through the police database and confirmed the active warrant on the defendant. *Id.*

¶ 38    The officer testified that he requested identification when he approached the defendant because he was not 100% certain it was Donnell Taylor. *Id.* ¶ 4. The defendant responded that he had no identification and gave the officer a false name and date of birth, after which a record check returned no such person. *Id.* The officer testified that he informed the defendant that he would arrest him for providing false information, that he knew his name was Donnell Taylor, and " '[t]his is your chance to tell the truth.' " *Id.* The officer stated that the defendant gave the false name again but, after conversing for a few minutes, the officer said to the defendant, " 'Hey, Donnell,' " and the defendant replied, " 'Yeah?' " *Id.* The officer then arrested him. *Id.* The officer testified that the entire encounter—from the time he approached the defendant until he arrested him—took less than 10 minutes. *Id.* The defendant was searched at the police department, and an identification bearing his correct name was found. *Id.* A trial was held, and the jury convicted the defendant of obstructing justice. *Id.* ¶ 6.

¶ 39    On appeal, the defendant in *Taylor* conceded that he had possessed the necessary intent (*id.* ¶ 9) but argued that the evidence was insufficient to support his conviction in that his giving

14

the false name to the officer did not materially impede the investigation because his arrest was complete within 5 to 10 minutes, despite his giving the false name. *Id.* ¶¶ 8, 9. To support his argument, the defendant in *Taylor* cited *People v. Comage*, 241 Ill. 2d 139 (2011), where the defendant was convicted of obstructing justice for concealing evidence by tossing a crack pipe over a fence while fleeing from police officers. *Taylor*, 2012 IL App (2d) 110222, ¶ 10.

¶ 40 In *Comage*, the officers saw the defendant throw the pipe and were able to recover it within 20 seconds. 241 Ill. 2d at 143. The Illinois Supreme Court noted in *Comage* that the obstructing justice statute does not define the word "conceal" (*id.* at 144), and set out to determine whether the evidence in that case was "concealed" within the meaning of the statute (*id.* at 140). In reviewing the issue, the court looked at two dictionary definitions of the word "conceal," one of which was relied on by the defendant and the other by the State (*id.* at 144), and discussed at length cases in which courts analyzed whether defendants concealed evidence in manners to satisfy the requirements of, *inter alia*, the obstructing justice statute (*id.* at 145-50).

¶ 41 *Strictly within the context of determining the meaning of the word "conceal,"* the Illinois Supreme Court indicated that, in enacting the obstructing justice statute, "the legislature intended to criminalize behavior that *actually* interferes with the administration of justice, *i.e.*, conduct that 'obstructs prosecution or defense of any person.' " (Emphasis in original.) *Id.* at 149. In determining whether the defendant concealed evidence, the court emphasized that the crack pipe and a push rod were thrown over the fence by the defendant and landed 10 feet away, the same of which was observed by the officers, who recovered the items within 20 seconds. On that basis, the court noted that, although the items were out of the officers' sight for a brief time span, the defendant's act did not materially impede the investigation. *Id.* at 150. Accordingly, the *Comage* court held that the defendant did not "conceal" the items within the meaning of the statute and reversed his conviction for obstructing justice. *Id.* at 150-51.

¶ 42    Thereafter, the *Taylor* court in the Second District broadened the application of *Comage*—which was limited to the issue of obstructing justice by concealing evidence—and reversed the defendant's conviction, holding that the State did not prove that the defendant's furnishing the false name materially impeded the administration of justice because the officer was able to arrest the defendant almost immediately, despite the false information. 2012 IL App (2d) 110222, ¶ 19.

¶ 43    The *Taylor* court also considered *People v. Baskerville*, in which the Illinois Supreme Court resolved the issue of "whether the offense of obstructing a peace officer *** necessitates proof of a physical act, and whether the evidence was sufficient to support [the] defendant's conviction." *People v. Baskerville*, 2012 IL 111056, ¶ 1. The court in *Baskerville* held that "knowingly furnishing a false statement to police may constitute obstruction of a peace officer *** where the statement interposes an obstacle that impedes or hinders the officer and is relevant to the performance of his authorized duties." *Id.* ¶ 38. The *Taylor* court stated that "*Baskerville* confirms that the relevant issue in weighing a sufficiency-of-the-evidence challenge to a conviction for obstruction of justice is whether the defendant's conduct actually posed a material impediment to the administration of justice." 2012 IL App (2d) 110222, ¶ 17.

¶ 44    Here, the defendant urges us to follow *Taylor* and reverse his conviction because he alleges that the State did not prove that his furnishing the false name caused a material impediment to the administration of justice. This court is not bound to follow *Taylor*. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) (opinion of one district is not binding on equal courts of other districts). We reiterate that *Comage*—upon which *Taylor* relied—was decided within the parameters of the supreme court's sole mission to determine the meaning of the word "conceal" as provided in the obstructing justice statute (241 Ill. 2d at 140) because the plain language of the statute provided no definition (*id.* at 144).

16

Notably, the *Taylor* court did not apply *Comage* in an effort to determine the definition of "furnishing false information."

¶ 45   We are mindful of the established law that, when the court "has interpreted a statute, that interpretation is considered as part of the statute itself unless and until the legislature amends it contrary to the interpretation." *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 387 (1998). Applying this principle to the case at bar, we fully acknowledge the supreme court's interpretation of the word "conceal" within the obstructing justice statute in *Comage* and how the definition ultimately established by the court incorporated a requirement of a material impediment to the administration of justice. However, the *Comage* court set forth its issue with precision and specificity to determine the meaning of concealing evidence, and we decline to follow *Taylor* by broadening that scope to encompass issues involving the furnishing of false information.

¶ 46   The court in *Taylor* also expanded the holding in *Baskerville*, which dealt with resisting or obstructing a peace officer (see 720 ILCS 5/31-1 (West 2014)), and applied it to reinforce its resolution of the issue involving obstructing justice (see *id.* § 31-4), a different statute with different elements. As with the *Comage* ruling, we decline to expand the *Baskerville* ruling as the *Taylor* court did.

¶ 47   The State cites *People v. Davis*, 409 Ill. App. 3d 457, 458 (2011), a Fourth District case in which the defendant was convicted of obstructing justice. Officers testified that they were seeking a fugitive named Bates—the father of the defendant's children—when they arrived at the home where the defendant was staying and asked her if she had seen Bates. *Id.* Defendant responded that she had not seen him and that only her brother and children were inside the home. *Id.* After the officers spoke privately with the defendant's brother, the defendant began crying and admitted that Bates was inside the home and that she was aware of outstanding warrants on

17

Bates. *Id.* at 459. The defendant was convicted of obstructing justice based on furnishing false information. *Id.* On appeal, the defendant cited *Comage* and argued that she did not materially impede the police investigation because, after providing the false information, she shortly thereafter recanted her earlier statement and confessed that Bates was in the house. *Id.* at 461.

¶ 48    The *Davis* court held that the "[d]efendant's interpretation of the supreme court's holding in *Comage* is too expansive." *Id.* The court explained that *Comage* was based on "what it meant to conceal evidence under the obstructing-justice statute," whereas *Davis* "involves knowingly furnishing false information to the police." *Id.* at 462. The court also discussed cases in which a defendant places evidence out of sight momentarily—an act that "does not make recovery of the evidence substantially more difficult or impossible," compared to cases involving the furnishing of false information, where "the potential that the investigation will be compromised is exceedingly high, which is why such a crime may be completed in a very short period of time— indeed, it may be completed at the moment such false information is provided." *Id.* The *Davis* court concluded that this was "precisely what happened in this case" (*id.*) and affirmed the defendant's conviction (*id.* at 463).

¶ 49    Despite the factual similarities between this case and *Taylor*, for the same aforementioned reasons as the court in *Davis*, we refuse to follow *Taylor*, and we decline to expand the *Comage* decision in the manner suggested by the defendant. Accordingly, we reject the defendant's argument that his conviction must be reversed because the State did not prove that his furnishing the false name materially impeded the administration of justice.

¶ 50                                CONCLUSION

¶ 51    For the foregoing reasons, we affirm the defendant's November 10, 2015, conviction.

¶ 52    Affirmed.

2019 IL App (5th) 160035

NO. 5-16-0035

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 15-CF-228 |
| | ) | |
| RASHEED CASLER, | ) | Honorable |
| | ) | Kimberly L. Dahlen, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**          **July 1, 2019**
_____

**Justices:**          Honorable David K. Overstreet, P.J.

                    Honorable Melissa A. Chapman, J., and
                    Honorable, James R. Moore, J.,
                    Concur

_____

**Attorneys**          James E. Chadd, State Appellate Defender, Ellen J. Curry, Deputy
**for**                 Defender, Daniel R. Janowski, Assistant Appellate Defender, Office
**Appellant**          of the State Appellate Defender, Fifth Judicial District, 909 Water
                    Tower Circle, Mt. Vernon, IL 62864

_____

**Attorneys**          Hon. Michael Carr, State's Attorney, Jackson County Courthouse,
**for**                 Murphysboro, IL 62966; Patrick Delfino, Director, Patrick D. Daly,
**Appellee**          Deputy Director, Jennifer Camden, Staff Attorney, Office of the State's
                    Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2,
                    Mt. Vernon, IL 62864

_____