NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200282-U

NO. 4-20-0282

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 25, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Moultrie County |
| ALVAN L. BOOTHS, | ) | No. 19CF7 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Wm. Hugh Finson, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The evidence was sufficient to sustain defendant's conviction for the attempted first degree murder of Holley Simmons.

(2) Defendant forfeited his argument the trial court erred in imposing consecutive sentences.

(3) Defendant forfeited his argument the court abused its discretion in sentencing him to two terms of natural-life imprisonment.

¶ 2     Following a jury trial, defendant, Alvan L. Booths, was convicted of two counts

of attempt (first degree murder) and one count of home invasion. The trial court sentenced him to

two consecutive terms of natural-life imprisonment and one term of 35 years' imprisonment.

Defendant appeals, arguing (1) the State failed to prove him guilty of one of the attempted

murder charges beyond a reasonable doubt, (2) the trial court erred in imposing consecutive sentences, and (3) his natural-life sentences are excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. The Charges

¶ 5            In early 2019, the State charged defendant, in relevant part, with attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)) (count I), home invasion (*id.* § 19-6(a)(5)) (count II), and attempt (first degree murder) (*id.* §§ 8-4(a), 9-1(a)(1)) (count V). Count I alleged defendant performed a substantial step toward the commission of first degree murder in that, with the intent to kill Otha Phillips, defendant caused great bodily harm to Phillips by shooting him in the neck with a firearm. Count V alleged defendant performed a substantial step toward the commission of first degree murder in that, with the intent to kill Holley Simmons, he "pointed a firearm at [her] and pulled the trigger, causing the firearm to jam."

¶ 6                              B. Pretrial Proceedings

¶ 7            Prior to trial, in April 2019, the trial court admonished defendant he faced mandatory consecutive sentencing if (1) convicted of either count I or II and count V and (2) the court found defendant inflicted "severe bodily injury."

¶ 8            In June 2019, the State filed a motion to present other-crimes evidence pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Specifically, the State sought to present evidence—in the form of coded letters and telephone conversations—demonstrating defendant attempted to solicit the murders of Phillips and

Simmons while in pretrial custody at the Moultrie County jail. The trial court granted the State's motion following a hearing.

¶ 9                                    C. The Jury Trial

¶ 10            Defendant's jury trial commenced on February 3, 2020, and concluded on February 11, 2020. We discuss only the evidence relevant to the issues raised on appeal.

¶ 11                               1. *The Evidence Presented*

¶ 12                                    a. Holley Simmons

¶ 13            Holley Simmons testified that on the evening of February 4, 2019, she was at her home along with her four children and several other young children she was babysitting. Simmons lived at the residence with Otha Phillips, and, although she shared two children with him, she explained they were "just roommates co-parenting." Simmons testified Phillips arrived home around 11 p.m. Shortly thereafter, Simmons heard a knock at the front door. Simmons opened the door and observed a man she did not recognize at the time but who she identified as defendant in court. Defendant asked if Phillips was home. Simmons told defendant she would get Phillips and, before doing so, while defendant was still outside, "closed the door just enough to where it was not all the way shut."

¶ 14            Simmons went to the bathroom where Phillips was preparing to take a shower and informed him someone was at the front door asking for him. Simmons then walked back to the entryway with Phillips behind her. When she turned the corner, she saw defendant had entered the house uninvited and was standing just inside the doorway. Simmons testified defendant did not say anything when he saw Phillips. Instead, according to Simmons, "all [she] heard was a sound[ ] that sounded like a balloon pop, and then [Phillips] fell to the floor." Simmons explained the ensuing events as follows:

- 3 -

"Q. So after you heard that 'pop' sound, what happened next?

A. [Phillips] got up and ran to the bathroom and told me to call 9-1-1. About that time I looked up and the guy at the door had the gun pointed up at me, and I just kept saying, 'I'm sorry.'

Q. Did you say anything else?

A. 'Please don't shoot me.'

Q. Now, did you—was [defendant] holding anything that you could see?

A. Just the gun in his hand.

Q. Was he taking any kind of action as he was holding the gun?

A. He had his hand on the gun and was trying to pull something back out. I don't know.

***

Q. What happened next?

A. I went down the hall. There is a hideaway where the furnace is at. *** I looked in the living room and my son is sitting on the floor rocking back and forth.

Q. At some point did [defendant] leave your home?

A. Yes, ma'am.

Q. And what did you do next?

A. I called 9-1-1."

¶ 15                                      b. Otha Phillips

¶ 16        Phillips testified similarly to Simmons with respect to their relationship and living situation. He further testified that on the night of February 4, 2019, he was at a meeting until

approximately 10 p.m. After the meeting, he picked up his girlfriend, Leslie Lawhorn, and her children, dropped them off at her house, and then returned home. Shortly after Phillips arrived home, as he was preparing to shower, Simmons informed him that someone was at the front door asking for him. Phillips then walked down the hallway towards the entryway, and when he turned the corner, he recognized defendant standing just inside the doorway. Phillips testified he had known defendant for about 14 years and he knew Lawhorn was defendant's ex-girlfriend.

¶ 17 Phillips testified that as soon as he saw defendant, he "stared him directly in the face, and all of a sudden he pulls out the gun and shoots." Phillips fell to the ground and heard Simmons screaming. He then got up and rushed to the bathroom where he realized he had been shot in the neck. When he was in the bathroom, he could still hear Simmons screaming at defendant and also "heard like kind of a click." About a minute later, Simmons came to the bathroom door and told him defendant had left.

¶ 18 Phillips testified that his neck was not bleeding very badly and he was able to remain calm until an ambulance arrived. He was taken to the hospital where he stayed receiving treatment for three days. Phillips testified the bullet entered his neck "almost where [his] jugular is" and exited "maybe an inch or two under [his] collarbone." Phillips had to undergo surgery and physical therapy to regain mobility in his arm.

¶ 19 c. Officer Bradley McReynolds

¶ 20 Bradley McReynolds, an officer with the Sullivan Police Department, was the responding officer. He initially made contact with Simmons and Phillips and then secured the area. Upon securing the area, he searched the inside of the house. McReynolds testified he observed "one spent bullet casing lying on the floor, as well as one live unfired one as well."

¶ 21 d. Chief Andrew Pistorius

¶ 22 Andrew Pistorius, chief of police for the Sullivan Police Department, testified that based on his training and experience with firearms, the shell casing found at the residence was fired from a 9-millimeter "semi-automatic pistol." Pistorius then explained how a semi-automatic firearm operates:

> "Q. So if somebody—to initiate firing a semi-automatic firearm, a magazine would be loaded and put into a firearm?
>
> A. Correct.
>
> Q. And then to load that first round, a person would have to pull the top back?
>
> A. Correct.
>
> Q. And then they would pull the trigger to fire the firearm, correct?
>
> A. Correct.
>
> Q. And then from there, if they wanted to fire a second round, would they have to pull back again?
>
> A. If it was functioning properly, no.
>
> Q. If somebody wanted to shoot a second round and something happened, as you say malfunctioning, what would happen potentially to that second round if it was malfunctioning?
>
> A. If it was a malfunction and the firearm did not fire, then you would have to pull the slide back in order to eject the unspent round and put a new one into the chamber."

¶ 23                                        e. Leslie Lawhorn

¶ 24        Leslie Lawhorn testified she had a prior relationship with defendant that ended in December 2017. Lawhorn and defendant also have two children together. Lawhorn testified that on February 4, 2019, she had been dating Phillips for approximately six months. Phillips gave Lawhorn and her children a ride home on that night, dropping them off around 10:30 p.m.

¶ 25                    f. Corrections Officer Erica Wilbur

¶ 26        Erica Wilbur, a corrections officer at the Moultrie County jail, testified that she was working on February 16, 2019. Defendant was in custody at the jail at this time. Another officer gave Wilbur a letter defendant had written to his mother. The letter was published to the jury and reads as follows:

> "This is Jay. There were 2 students inside the school building, a male student and a female student. They both saw me with the clipboard, so they told the principal on me. Now the principal sent me to Detention because they both told the principal. If they get expelled, I get out of Detention and I can be home schooled."

¶ 27                    g. Officer Kyle Border

¶ 28        Kyle Border, an officer with the Illinois State Police, took part in the investigation of the shooting. He testified that personnel from the Moultrie County jail notified him of letters and telephone conversations involving defendant that were pertinent to the investigation. Recordings of the telephone conversations were admitted into evidence and played for the jury. In the phone calls, which were to defendant's mother and brother, defendant speaks in similar coded language as contained in the letter testified to by Wilbur. The following is a portion of a transcribed conversation between defendant and his brother, Boo, that occurred on March 7, 2019:

"[DEFENDANT]: Have you talked to anybody?

BOO: Hello? I holla'ed at two motha f*** man. They talking bout that's a white neighborhood and they ain't comin down there bro.

\*\*\*

[DEFENDANT]: You shouldn't have never told them it was a white neighborhood.

BOO: \*\*\* What you talkin bout? How the f*** I'm gonna tell 'em come do something and they not know where they going, bro? I told 'em I'd give 'em two pillows bro. Two pillows of weed they said that, bro. Come on man, then I told 'em the location, they said hell nah.

\*\*\*

BOO: Man, you need to call Deville man.

[DEFENDANT]: Bro, I already told you, look, mommy already talked to Deville about, ask mommy. They scared. They not tryin to do it. Them n*** ain't never held nothin.

\* \* \*

[DEFENDANT]: Man. They gonna give a n*** life man."

¶ 29                                    h. Defendant

¶ 30        Defendant testified in his own behalf. Defendant denied shooting or pointing a gun at anyone. He asserted he was driving to Champaign with a friend to buy drugs on the night in question.

¶ 31                                    2. *Finding of Guilt*

¶ 32        The jury found defendant guilty as to each count.

¶ 33                                    D. Sentencing

¶ 34            On June 23, 2020, the trial court conducted a sentencing hearing. At the outset,

the court noted it had considered the presentence investigation report (PSI). According to the

PSI, defendant's criminal history consisted of four felony convictions—armed robbery,

aggravated battery, misuse of a credit card, and the manufacture and delivery of between 1 and

15 grams of cocaine—and two misdemeanor domestic battery convictions. The State presented

in aggravation the testimony of Officer Ryan Hurst and Otha Phillips and requested that the court

take judicial notice of the trial testimony tending to demonstrate defendant attempted to solicit

the murders of Phillips and Simmons while in pretrial custody.

¶ 35            Officer Hurst, a lieutenant with the Mattoon Police Department, testified he

investigated an alleged home invasion and battery involving defendant that occurred on

December 29, 2017. Hurst testified that Leslie Lawhorn had reported defendant broke into an

apartment while Lawhorn was present and battered her as she was holding their five-month-old

child. Lawhorn received medical attention as a result of the alleged battery. Hurst further

testified defendant was charged with home invasion in Coles County case No. 18-CF-18, which

was still pending at the time of sentencing, and he was free on bond in that case when he

committed the offenses in the instant case.

¶ 36            Otha Phillips testified in further detail about the injuries he sustained. Phillips

explained that after he underwent surgery and physical therapy for the nerve damage he

sustained, he only regained about 85% functionality of his left arm. Phillips further testified he

suffers from "severe PTSD" because of the shooting and attends weekly counseling sessions.

¶ 37            Defendant offered no evidence in mitigation, averring instead that he would

"stand by his innocence."

¶ 38    Ultimately, the trial court sentenced defendant to three consecutive terms of 20

years' imprisonment, with firearm enhancements of natural life added to counts I and II and 15

years added to count V. See 720 ILCS 5/8-4(c)(1)(B), (D), 19-6(c) (West 2018). In imposing

natural-life imprisonment, the court specifically highlighted the following in aggravation: (1) the

physical harm suffered by Phillips; (2) the trauma experienced by Phillips, Simmons, and the

children who were present at the time of the shooting; (3) defendant's extensive criminal history;

(4) the fact defendant was free on bond in an unrelated case when he committed the instant

offenses; and (5) the evidence tending to demonstrate defendant attempted to solicit the murders

of Phillips and Simmons while in pretrial custody. Moreover, in ordering the sentences to run

consecutively, the court stated it "finds specifically that the injury to Mr. Phillips does constitute

great bodily harm."

¶ 39    This appeal followed.

¶ 40                                II. ANALYSIS

¶ 41    Defendant argues (1) the evidence was insufficient to prove he attempted to

murder Simmons beyond a reasonable doubt, (2) the trial court erred in imposing consecutive

sentences, and (3) his natural-life sentences are excessive.

¶ 42                          A. Sufficiency of the Evidence

¶ 43    Defendant first argues the State failed to prove him guilty of the attempted murder

of Holley Simmons, as alleged in count V, because the evidence failed to show he took a

substantial step toward the commission of murder with the specific intent to kill Simmons.

Defendant maintains the evidence was "wholly insufficient to prove [he] pulled the trigger while

the gun was pointed at Simmons."

¶ 44    When reviewing the sufficiency of the evidence, the "critical inquiry" is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses[,]" as "it is the responsibility of the trier of fact to 'fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Cooper*, 194 Ill. 2d 419, 431, 743 N.E.2d 32, 40 (2000) (quoting *Jackson*, 443 U.S. at 319). All reasonable inferences from the record must be allowed in favor of the State. *People v. Cunningham*, 212 Ill. 2d 274, 280, 818 N.E.2d 304, 308 (2004). Reviewing courts will not set aside a conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 276 (1985).

¶ 45    To sustain a conviction for attempt (first degree murder), the State must prove the following two elements beyond a reasonable doubt: (1) the defendant performed an act constituting a substantial step toward the killing of an individual and (2) he performed the act with the specific intent to kill the individual. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018). "Intent is a state of mind and thus is usually difficult to establish by direct evidence. [Citation.] Accordingly, specific intent to kill may be, and normally is, inferred from the surrounding circumstances, such as the character of the attack, the use of a deadly weapon [citation], and the nature and extent of the victim's injuries [citation]." *People v. Parker*, 311 Ill. App. 3d 80, 89, 724 N.E.2d 203, 210 (1999).

¶ 46    Here, viewed in the light most favorable to the State, we find the evidence was sufficient to prove defendant attempted to murder Simmons by pointing a loaded firearm at her

and pulling the trigger. Simmons testified that after defendant shot Phillips, he pointed the firearm at her and "had his hand on the gun and was trying to pull something back out." Phillips testified that after he had been shot and fled to the bathroom, he could hear Simmons saying, "don't shoot," and then he heard a "click." Chief Pistorius explained how semi-automatic firearms operate and testified it was not necessary to pull back the slide before firing a second round. However, according to Pistorius, if the firearm malfunctioned when attempting to fire a second round, "you would have to pull the slide back in order to eject the unspent round and put a new one into the chamber." Moreover, officers recovered a live round near the entryway.

¶ 47　　　　The above testimony constitutes strong circumstantial evidence that defendant pointed a loaded firearm at Simmons and pulled the trigger. See *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 84, 996 N.E.2d 1227 ("We agree *** that defendant's racking the slide constitutes strong circumstantial evidence that he believed the gun had malfunctioned once he unsuccessfully attempted to discharge it at the police."). Given that defendant had just shot Phillips in the neck, and Simmons subsequently observed him pulling back the slide on the semi-automatic firearm he was pointing at her—which would only be necessary if the firearm had malfunctioned—a jury could reasonably infer defendant pulled the trigger while pointing the firearm at her, but it failed to fire due to a malfunction. The later discovery of a live round on the floor supports the inference the gun was loaded when defendant initially pointed it at Simmons and pulled the trigger, with the live round being ejected after defendant operated the firearm's slide. Accordingly, because it would be reasonable to draw these inferences, we must allow them in favor of the State, and we conclude the evidence was sufficient to prove defendant attempted to murder Holley Simmons. See *Cunningham*, 212 Ill. 2d at 280 (stating courts of review must allow all reasonable inferences in favor of the State).

¶ 48    We note that defendant cites to *People v. Okundaye*, 189 Ill. App. 3d 601, 605-06, 545 N.E.2d 505, 509 (1989), for the proposition that "merely pointing a gun in the direction of [someone] while pulling back the slide was not itself a substantial step towards the commission of murder." However, we find defendant's reliance on this case misplaced, as *Okundaye* does not stand for the proposition defendant advances. Instead, *Okundaye*, holds that "the mere pointing of a loaded gun in [someone's] face does not necessarily *per se* constitute a substantial step towards the commission of attempted murder." *Id.* at 606. Here, defendant did not merely point a loaded gun at Simmons; he pointed a loaded gun at her *and*, based on the previously referenced circumstantial evidence, *pulled the trigger*. Accordingly, *Okundaye* is not supportive of defendant's argument.

¶ 49                    B. Imposition of Consecutive Sentences

¶ 50    Defendant next argues the trial court erred in imposing consecutive sentences because it made a finding Phillips suffered "great bodily harm," whereas the consecutive sentencing statute mandates a finding of "severe bodily injury." Citing to *People v. Alvarez*, 2016 IL App (2d) 140364, 58 N.E.3d 147, defendant contends great bodily harm is a distinct and less demanding standard than severe bodily injury and a finding of the former is insufficient to impose consecutive sentences. Defendant acknowledges he forfeited this claim by failing to both object at the sentencing hearing and raise it in a postsentencing motion. See, *e.g.*, *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Nonetheless, he maintains we may address it under the plain-error doctrine or, alternatively, as a matter of ineffective assistance of counsel.

¶ 51          The plain-error doctrine is a "narrow and limited exception" to the general rules of forfeiture. *Id.* at 545. To obtain relief under the doctrine, a defendant "must first show that a clear or obvious error occurred." *Id.* "Plain-error review is reserved for errors that are clear or obvious based on law that is well settled at the time of trial; if the law was unclear at the time of the trial ***, then the error is not 'plain' for purposes of the plain-error doctrine." (Internal quotation marks omitted.) *People v. Williams*, 2015 IL App (2d) 130585, ¶ 11, 33 N.E.3d 608; see also *In re M.W.*, 232 Ill. 2d 408, 431, 905 N.E.2d 757, 773 (2009). If the defendant makes the requisite showing of error, in the sentencing context, he "must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545. The defendant has the burden of persuasion under both prongs, and failure to satisfy the burden results in the forfeiture being honored. *Id.* "The ultimate question of whether a forfeited claim is reviewable as plain error is a question of law that is reviewed *de novo*." *People v. Johnson*, 238 Ill. 2d 478, 485, 939 N.E.2d 475, 480 (2010).

¶ 52          Section 5-8-4 of the Unified Code of Corrections (Code) provides for mandatory consecutive sentencing when, in relevant part, "[o]ne of the offenses for which the defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted *severe bodily injury*." (Emphasis added.) 730 ILCS 5/5-8-4(d)(1) (West 2018). In *People v. Witherspoon*, 379 Ill. App. 3d 298, 307-08, 883 N.E.2d 725, 733 (2008), in imposing consecutive sentences under section 5-8-4, the trial court stated it was "going to refer back to the jury's finding" of great bodily harm at trial. On appeal, the defendant argued the sentencing court failed to comply with the statute because it did not make a finding of severe bodily injury. *Id.* at 308. This court rejected the defendant's argument on the basis that the "difference between

'great bodily harm' and 'severe bodily injury' is merely semantic; no meaningful distinction can be made between 'great' and 'severe' or between 'harm' and 'injury.' " *Id.* Thus, in *Witherspoon*, we concluded that a finding of great bodily harm was sufficient to affirm the imposition of consecutive sentences under section 5-8-4 the Code. *Id.*

¶ 53　　　　In *Alvarez*, the Second District explicitly disagreed with our holding in *Witherspoon*. *Alvarez*, 2016 IL App (2d) 140364, ¶ 24. In that case, the trial court, in imposing consecutive sentences, relied on its previous finding made at trial that the defendant had caused great bodily harm when committing the offense of attempt (first degree murder). *Id.* ¶¶ 20-21. The *Alvarez* court found this was "insufficient to support a finding of severe bodily injury under section *** 5-8-4(d)(1) for purposes of consecutive sentencing, because ['great bodily harm' and 'severe bodily injury'] are two different standards." *Id.* ¶ 21. The Second District reasoned the two concepts were distinct in that a finding of great bodily harm in the context of an attempted murder conviction relates to whether a sentencing enhancement applies (see 720 ILCS 5/8-4(c)(1)(D) (West 2008)), whereas a finding of severe bodily injury relates to whether consecutive sentences must be imposed (see 730 ILCS 5/5-8-4(d)(1) (West 2008)). *Alvarez*, 2016 IL App (2d) 140364, ¶ 24. According to the *Alvarez* court, because the legislature chose to use one phrase in one context and the other phrase in a separate context, "[a] finding of 'great bodily harm' does not necessarily or automatically result in a finding of 'severe bodily injury' for purposes of consecutive sentencing." *Id.* ("Thus, without the trial court's explicit finding of 'severe bodily injury,' we decline to uphold the imposition of consecutive sentences pursuant to section 5-8-4(d)(1) of the Code solely on its finding of 'great bodily injury' in connection with a sentencing enhancement.").

¶ 54        Here, defendant argues the court committed plain error by imposing consecutive sentences where it relied on a finding of "great bodily harm" rather than "severe bodily injury." However, defendant's argument must fail because, at the time of defendant's sentencing, case law from this appellate district provided support for the trial court's decision to impose consecutive sentences. As discussed above, in *Witherspoon*, this court concluded a finding of great bodily harm was sufficient to affirm the imposition of consecutive sentences under section 5-8-4 of the Code. See *Witherspoon*, 379 Ill. App. 3d at 307-08. Also, as noted, in *Alvarez*, the Second District explicitly rejected our holding in *Witherspoon* and instead declined to uphold the imposition of consecutive sentences solely on a finding of great bodily harm. See *Alvarez*, 2016 IL App (2d) 140364, ¶ 24. However, because at the time of defendant's sentencing it was not well-settled whether a finding of great bodily harm, as opposed to severe bodily injury, was sufficient for purposes of imposing consecutive sentences under section 5-8-4, the purported error now before us, by definition, cannot be considered "plain" for purposes of the plain-error doctrine. See, *e.g.*, *Williams*, 2015 IL App (2d) 130585, ¶ 11 ("Plain-error review is reserved for errors that are clear or obvious based on law that is well settled at the time of trial; if the law was unclear at the time of the trial ***, then the error is not 'plain' for purposes of the plain-error doctrine." (Internal quotation marks omitted.)).

¶ 55        Defendant argues in the alternative that counsel's failure to object to the imposition of consecutive sentences amounted to ineffective assistance of counsel.

¶ 56        Ineffective-assistance-of-counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984) (adopting the *Strickland* standard). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient

and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 79, 106 N.E.3d 944.

¶ 57        Here, defendant cannot establish either *Strickland* prong. Because *Witherspoon* supported the trial court's decision to impose consecutive sentences in the manner that it did, he cannot establish counsel was deficient by failing to object. Further, he cannot establish prejudice for the same reason—if counsel had objected, the trial court likely would have overruled the objection, again based on *Witherspoon*. Thus, defendant's ineffective assistance of counsel argument fails.

¶ 58                        C. Excessive Sentences

¶ 59        Defendant's final argument is that his sentences of natural-life imprisonment are excessive. He asserts "the underlying circumstances and the extent of Phillips' injuries did not justify a maximum sentence" and the sentences were improperly imposed "without any view towards rehabilitation." Defendant acknowledges he forfeited this claim by failing to object at the sentencing hearing and raise it in a postsentencing motion. See, *e.g.*, *Hillier*, 237 Ill. 2d at 544 ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). He nonetheless maintains we may review it under the plain-error doctrine.

- 17 -

¶ 60    "Although the legislature has prescribed the permissible ranges of sentences, great discretion still resides in the trial judge in each case to fashion an appropriate sentence within the statutory limits." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). In fashioning an appropriate sentence, the trial court must consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of [the] defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109, 772 N.E.2d 833, 846 (2002). "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Fern*, 189 Ill. 2d at 53. "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Id.* at 54.

¶ 61    Here, regarding counts I and II, defendant was convicted of attempt (first degree murder) (720 ILCS 5/8-4(a), (c)(1)(D), 9-1(a)(1) (West 2018)) and home invasion (*id.* § 19-6(a)(5), (c)), both of which are Class X felonies carrying a sentencing range of 6 to 30 years' imprisonment. See 730 ILCS 5/5-4.5-25(a) (West 2018) (providing sentencing range for Class X felonies). In addition, because the jury found defendant discharged a firearm that caused great bodily harm during the commission of the offenses, he faced sentencing enhancements of 25 years to natural-life imprisonment. See 720 ILCS 5/8-4(c)(1)(D), 19-6(c) (West 2018). The trial court imposed the maximum sentence of natural-life imprisonment on both counts.

¶ 62    We find defendant has failed to establish the trial court clearly abused its discretion in sentencing him to life imprisonment, as a review of the record shows the court

considered and balanced the applicable factors in aggravation and mitigation. In imposing the maximum sentence, the court highlighted the substantial amount of evidence presented in aggravation. Specifically, the court relied on the following: (1) the physical harm suffered by Phillips; (2) the trauma experienced by Phillips, Simmons, and the children who witnessed the shooting; (3) defendant's extensive criminal history; (4) the fact defendant was free on bond in an unrelated case when he committed the instant offenses; and (5) the evidence tending to demonstrate defendant attempted to solicit the murders of Phillips and Simmons while in pretrial custody at the Moultrie County jail. These aggravating factors notwithstanding, defendant maintains the court abused its discretion by imposing the sentences "without any view towards rehabilitation." However, in view of the lack of any evidence presented in mitigation and that defendant declined to participate in the preparation of the presentence investigation report, there was a dearth of evidence establishing his rehabilitative potential. Accordingly, given the substantial amount of evidence in aggravation and the lack of evidence in mitigation, we cannot say the trial court clearly abused its discretion in imposing the maximum sentence.

¶ 63                                III. CONCLUSION

¶ 64          For the reasons stated, we affirm the trial court's judgment.

¶ 65          Affirmed.